# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

|  |  |
|---|---|
| CHEVRON U.S.A. INC., | ) |
| | ) |
| *Petitioner,* | ) No. _____ |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, | ) |
| | ) |
| *Respondent.* | ) |
| | ) |

## PETITION FOR REVIEW

In accordance with Section 307(b) of the Clean Air Act, 42 U.S.C. § 7607(b), the Administrative Procedure Act, 5 U.S.C. § 706, Federal Rule of Appellate Procedure 15(a), and Circuit Rule 15-1, Chevron U.S.A. Inc. ("Chevron") petitions this Court for review of the final action taken by the United States Environmental Protection ("EPA") on April 20, 2021, which is attached as Exhibit A:

> Letter from Joseph Goffman, Acting Assistant Administrator of the Office of Air and Radiation to Walid Masri, West Coast Decommissioning Program Director for Chevron U.S.A. Inc., *Additional Environmental Protection Agency (EPA) Views on Outer Continental Shelf Decommissioning Activities at Chevron U.S.A. Inc. Gail and Grace Platforms* (Apr. 20, 2021) (Ex. A).

EPA's April 20, 2021 decision, revoked EPA's earlier final January 19, 2021 decision, which is attached as Exhibit B. *See* Letter from Karl Moor, Deputy Assistant Administrator for the Office of Air and Radiation to Walid Masri, West Coast Decommissioning Program Director for Chevron U.S.A. Inc., *Applicability Determination for Outer Continental Shelf Decommissioning Activities at Chevron U.S.A. Inc. Gail and Grace Platforms* (Jan. 19, 2021) (Ex. B).

EPA's April 20 decision is a "nationally applicable" agency action for which venue is proper in this United States Court of Appeals for the District of Columbia Circuit under 42 U.S.C. § 7607(b). Because the time limit for filing a petition under § 7607(b) is jurisdictional, Chevron has also filed, as a protective measure only, a petition for review in this Court—the proper venue for "a locally or regionally applicable" action (which this is not). Chevron intends to confer with the EPA and request that this petition either (1) be held in abeyance pending litigation in the D.C. Circuit, or (2) be dismissed if the EPA consents to venue in the D.C. Circuit.

Dated: June 18, 2021

Respectfully submitted,

/s/ Ashley C. Parrish
Ashley C. Parrish
 *Counsel of Record*
Ilana Saltzbart
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Washington, DC 20006
(202) 737-0500
aparrish@kslaw.com
isaltzbart@kslaw.com

Marella Burke
I. Cason Hewgley IV
KING & SPALDING LLP
1100 Louisiana Street
Suite 4100
Houston, TX 77002
(713) 751-3200
mburke@kslaw.com
chewgley@kslaw.com

*Counsel for Petitioner*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CHEVRON U.S.A. INC.,

      *Petitioner*,

      v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY,

      *Respondent*.

)
)
)
)
)
)
)
)
)
)
)
)
)

No. _____

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), Petitioner Chevron U.S.A. Inc. certifies that it was incorporated in Pennsylvania on August 9, 1922, as Gulf Oil Corporation of Pennsylvania.  Its name was changed to Gulf Oil Corporation on May 5, 1936.  On July 1, 1985, Chevron U.S.A. Inc., a California corporation, merged into Gulf Oil Corporation, and Gulf Oil Corporation changed its name to Chevron U.S.A. Inc.  Chevron U.S.A. Inc. is an indirect, wholly owned subsidiary of Chevron Corporation, a publicly traded company (NYSE: CVX).

Dated: June 18, 2021

Respectfully submitted,

<u>/s/ Ashley C. Parrish</u>
Ashley C. Parrish
 *Counsel of Record*
Ilana Saltzbart
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Washington, DC 20006
(202) 737-0500
aparrish@kslaw.com
isaltzbart@kslaw.com

Marella Burke
I. Cason Hewgley IV
KING & SPALDING LLP
1100 Louisiana Street
Suite 4100
Houston, TX 77002
(713) 751-3200
mburke@kslaw.com
chewgley@kslaw.com

*Counsel for Petitioner*

# CERTIFICATE OF SERVICE

I hereby certify that June 18, 2021, I electronically filed the forgoing Petition for Review and Corporate Disclosure Statement with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the appellate CM/ECF system. I also caused the foregoing to be served by UPS Next-Day delivery and by e-mail, upon the following:

Hon. Michael S. Regan
Administrator
U.S. ENVIRONMENTAL
PROTECTION AGENCY
Office of the Administrator
(1101A)
1200 Pennsylvania Avenue NW
Washington, D.C. 20460
Regan.Michael@epa.gov

Ms. Melissa Hoffer
Acting General Counsel
U.S. ENVIRONMENTAL
PROTECTION AGENCY
1200 Pennsylvania Avenue NW
Washington, D.C. 20460

U.S. ENVIRONMENTAL
PROTECTION AGENCY
Office of Air and Radiation
(64033A)
Mail Code 6103A
1200 Pennsylvania Avenue NW
Washington, D.C. 20460

Correspondence Control Unit
U.S. ENVIRONMENTAL
PROTECTION AGENCY
Office of General Counsel (2311)
1200 Pennsylvania Avenue NW
Washington, D.C. 20460

Hon. Merrick B. Garland
Attorney General
U.S. DEPARTMENT
OF JUSTICE
950 Pennsylvania Avenue NW
Washington, D.C. 20530

Ms. Jean E. Williams
Acting Assistant Attorney General
U.S. DEPARTMENT
OF JUSTICE
Law and Policy Section
Environment and Natural
Resources Division
950 Pennsylvania Avenue NW
Washington, D.C. 20530

/s/ Ashley C. Parrish
Ashley C. Parrish

*Counsel for Petitioner*

# Exhibit A



# UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
## WASHINGTON, D.C. 20460

April 20, 2021

OFFICE OF
AIR AND RADIATION

Mr. Walid Masri
Program Director
West Coast Decommissioning Program
Chevron USA Inc.
3916 State Street, Suite 200,
Santa Barbara, California 93105

Via email at *wmsr@chevron.com*

Re:     Additional Environmental Protection Agency (EPA) Views on Outer Continental Shelf
        Decommissioning Activities at Chevron U.S.A. Inc. Gail and Grace Platforms

Dear Mr. Masri:

As you know, on January 19, 2021, the Office of Air and Radiation (OAR) of the Environmental Protection Agency (EPA) sent you a letter providing EPA's view regarding the applicability of the Outer Continental Shelf (OCS) regulations and requirements under section 328 of the Clean Air Act (CAA or Act) to the decommissioning activities for the Gail and Grace offshore drilling Platforms (the Platforms) located off the coast of Ventura County, California. In the January 19 letter, EPA expressed agreement with the position taken by Chevron in its September 8, 2020, letter to EPA that the Platforms will cease to emit any air pollutant and be OCS sources following the completion of the Pre-Abandonment and Abandonment phases of the decommissioning process. This letter provides additional analysis on this topic and supersedes the January 19 letter (enclosed).

EPA maintains its view that CAA permitting requirements for OCS sources cease to apply once the relevant "equipment, activity, or facility" no longer satisfies the criteria in the definition of "OCS source" in section 328 of the CAA and EPA's implementing regulations at 40 C.F.R. part 55.[1]

---

[1] The Environmental Advisory Board (EAB) decisions cited in the September 8, 2020, Chevron Letter demonstrate that a facility that previously was considered an OCS source can cease to be an OCS source when the definitional criteria are no longer met. *See In Re: Shell Gulf of Mexico, Inc., Shell Offshore, Inc*, 15 E.A.D. 470 (EAB Jan. 12, 2012); *see also In Re: Shell Gulf of Mexico, Inc., Shell Offshore, Inc.*, 15 E.A.D. 103 (EAB Dec. 30, 2010). These decisions focused on when an anchored drillship is considered an OCS source based on the criteria in the regulatory definition of OCS source in 40 C.F.R. § 55.2 specific to vessels ("[p]ermanently or temporarily attached to the seabed and erected thereon and used for the purpose of exploring, developing or producing resources therefrom."). These cases establish that a drillship can be considered an OCS source when meeting the definitional criteria in 40 C.F.R. § 55.2, and, subsequently, cease to be considered an OCS source when no longer meeting the specific facet of the OCS source definition. It follows that when another facet of the same definition (potential to emit) is no longer met, a facility being treated as an OCS source would likewise cease to be an OCS source.

In addition, the Agency maintains the position that associated vessel emissions alone are not sufficient to satisfy the potential to emit criteria necessary to establish an OCS source and that the Platforms would no longer qualify as OCS sources after all existing emissions-generating equipment is removed from the Platforms. However, in the January 19 letter, EPA did not sufficiently evaluate the possibility that additional activity conducted at the site or equipment used to dismantle the Platforms after the Pre-Abandonment and Abandonment phases may be classified as an "OCS source" under certain conditions. EPA also failed to recognize in the January 19 letter that the delegated OCS permitting authority for the Platforms, the Ventura County Air Pollution Control District (the "District"), is the appropriate authority to make an applicability determination in this case, in consultation with EPA, after a more detailed evaluation of the activities to be conducted and equipment to be used at the site after the Pre-Abandonment and Abandonment phases is completed.

Section 328(a)(4)(C) of the Act states that an "OCS source" includes "any equipment, activity, or facility" that "(i) emits or has the potential to emit any air pollutant, (ii) is regulated or authorized under the Outer Continental Shelf Lands Act (OSCLA), and (iii) is located on the [OCS] or in or on waters above the [OCS]." Of the three criteria in CAA section 328(a)(4)(C), the one[2] most germane to the question raised in your September 8, 2020 letter is whether the Platforms "emit[] or ha[ve] the potential to emit any air pollutant." Section 328(a)(4)(C) of the CAA further states that "[f]or purposes of this subsection, emissions from any vessel *servicing or associated with an OCS source*, including emissions while at the OCS source or en route to or from the OCS source within 25 miles of the OCS source, shall be considered direct emissions from *the OCS source*" (emphasis added). This latter sentence in the definition of OCS source draws a clear distinction between the OCS source and any vessel servicing or associated with that source. Thus, the vessel in this context is not the OCS source, and the emissions from these types of vessels are not deemed to be emissions from an OCS source if there is no longer an OCS source present. For a vessel to service or associate with an OCS source, there must be equipment, an activity, or a facility that meets the three OCS source criteria independent of such vessel and is therefore an OCS source. Thus, if all emissions-generating equipment is permanently-removed from the Platforms during the Pre-Abandonment and Abandonment phases of the decommissioning process and no subsequent "equipment, activity, or facility" constituting an "OCS source" exists at the site, neither the Platforms nor the vessels servicing or associated with the Platforms would be subject to OCS permitting requirements.

However, in this situation, the applicability of OCS permitting requirements also depends on whether other equipment or facilities brought to the site (e.g., vessels or barges) or new activities conducted at the site qualify as an OCS source for some period after the completion of the Pre-Abandonment and Abandonment phases.[3] The second sentence of CAA section 328(a)(4)(C) states that OCS source activities "include, but are not limited to, platform and drill ship exploration,

---

[2] Regarding the Platforms, the last criterion is clearly satisfied because they continue to be located on the OCS. EPA does not administer OSCLA, but the Department of Interior Bureau of Safety and Environmental Enforcement directive to decommission the Platforms suggests that they continue to be regulated under OCSLA and thus meet the second criterion of the OCS source definition.

[3] Emissions from vessels associated with this OCS source would then also be treated as direct emissions from the OCS source until the emissions from the OCS source have permanently ceased.

construction, development, production, processing, and transportation." The dismantling of a platform or the demolition or "deconstruction" of such a structure could be viewed to be similar to the other activities in this sentence. The list of activities covered by the statute is clearly not exclusive. In addition, a vessel may itself become an OCS source, if it meets the criteria in CAA section 328(a)(4)(C) and EPA's implementing regulations at 40 C.F.R. part 55. Section 55.2 of these regulations provides that a vessel qualifies as an OCS source when it is "[p]ermanently or temporarily attached to the seabed and erected thereon and used for the purpose of exploring, developing or producing resources therefrom."[4] Although the Agency acknowledged this possibility in the January 19 letter, EPA's conclusion that the circumstances presented did not suggest these criteria would be met by any of the vessels employed by Chevron to decommission the Platforms lacked sufficient foundation.

A detailed understanding of Chevron's proposed decommissioning process for the Platforms, including the type of equipment to be used after the Pre-Abandonment and Abandonment phases, will be necessary to determine the appropriate point at which no "OCS source" exists at the site and OCS permitting requirements cease to apply. Given the importance of these facts to this determination, we encourage you to provide detailed information to the District about Chevron's proposed decommissioning activities so that the District can take such information into account before making an applicability determination. Separately, we are encouraging the District to consult with us prior to making a final determination, pursuant to the existing delegation agreement.

As stated in EPA's January 19, 2021, letter, the District's May 21, 2019, guidance regarding offshore oil and gas platform decommissioning does not evaluate the applicability of section 328 of the CAA or EPA's implementing regulations at 40 C.F.R part 55. Instead, the District's guidance interprets only the "stationary source" definition in the District's NSR and Title V permitting regulations, which are requirements of the corresponding onshore area (COA) which apply to OCS sources within 25 miles of the state seaward boundary under section 328(a)(1) of the CAA and 40 C.F.R. § 55.14. If the District determines, after further review and consultation with EPA, that an OCS source remains until some point after the Pre-Abandonment and Abandonment phases of the decommissioning process, then the 40 C.F.R. part 55 regulations would continue to apply, and thus, the District's regulations as incorporated into 40 C.F.R. part 55 (and the District's interpretation of those regulations) would also continue to apply until such source no longer exists. If, however, no "OCS source" exists at the site following the Pre-Abandonment and Abandonment phases and the 40 C.F.R. part 55 regulations cease to apply, then the COA requirements in the Ventura County APCD regulations and the District's guidance interpreting those requirements would also cease to apply.

---

[4] 40 C.F.R. § 55.2 also says that a vessel may be an OCS source when it is "[p]hysically attached to an OCS facility, in which case only the stationary source aspects of the vessels will be regulated."

3

If you have any questions regarding this letter, please contact Scott Mathias at *mathias.scott@epa.gov* or at (919) 541-5310.

Sincerely,

Joseph Goffman
Acting Assistant Administrator

Enclosure

# Exhibit B



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D.C. 20460

OFFICE OF
AIR AND RADIATION

January 19, 2021

Walid Masri
Program Director
West Coast Decommissioning Program
Chevron USA Inc.
wmsr@chevron.com

Re: Applicability Determination for Outer Continental Shelf
Decommissioning Activities at Chevron U.S.A. Inc. Gail and
Grace Platforms

Dear Mr. Masri:

In response to your September 8, 2020 letter from Chevron
U.S.A. Inc (Chevron) to the Office of Air and Radiation (OAR)
of the U.S. Environmental Protection Agency (EPA), I am
writing to confirm EPA's agreement with Chevron's view that
the Gail and Grace offshore drilling platforms located off the
coast of Ventura County, California (the Platforms), will cease to
be Outer Continental Shelf (OCS) sources following the
completion of the Pre-Abandonment and Abandonment phases
of the decommissioning process that you described. Chevron
requested an EPA determination that, when the Platforms no
longer emit or have the potential to emit any pollutant, the OCS
source requirements under section 328 of the Clean Air Act
(CAA) will cease to be applicable because the platforms will no
longer be OCS sources, as defined in section 328 of the Clean
Air Act (CAA) and the OCS regulations at 40 C.F.R. Part 55.
This will take place when all equipment on the platforms that
generate air pollutant emissions are permanently disabled and
Chevron surrenders the Platforms' operating permits. Once the
platforms cease to be OCS sources, they will also no longer be
subject to the relevant regulations of the corresponding onshore
area (COA), in this instance Ventura County Air Pollution
Control District (APCD), that are listed in 40 C.F.R. Part 55
pursuant to the requirements articulated in section 328 of the
CAA. The practical effect of this non-applicability

determination by EPA is that, after the Platforms cease to be OCS sources, the emissions from vessels associated with the OCS source and within 25 miles of the platforms will not be subject to OCS permitting requirements, via the statutory and regulatory provisions requiring the consideration of associated vessel emissions as direct emissions from the OCS sources, as set forth in section 328 of the CAA and 40 C.F.R. 55.2.

This applicability determination is predicated on the specific facts described in the September 8, 2020 Chevron Letter. For the reasons discussed below, EPA has concluded that the Platforms will cease to be OCS Sources after the Pre-Abandonment and Abandonment phases of the decommissioning process you described.

## Background

The Department of Interior's Bureau of Safety and Environmental Enforcement (BSEE) directed Chevron to decommission the Platforms. The Platforms are oil and gas platforms located offshore of Ventura County: Platform Gail (built in 1987, 9.9 miles offshore, 739 ft deep) and Platform Grace (built in 1979, 10.5 miles offshore, 318 ft deep). Both platforms are currently considered OCS sources subject to 40 C.F.R. Part 55 OCS permitting requirements established under section 328 of the CAA. Pursuant to these requirements, both sources hold Title V operating permits issued by Ventura County APCD, the relevant delegated OCS permitting authority. Ventura County APCD, a subdivision of the State of California, was delegated authority from EPA to "implement and enforce" the Part 55 OCS air regulations per a delegation agreement signed by EPA Region 9 on January 27, 1994.

Santa Barbara County APCD, South Coast Air Quality Management District, and Ventura County APCD jointly issued a May 21, 2019 Guidance Letter (APCD Guidance) regarding offshore oil and gas platform decommissioning. Specifically, the APCD Guidance addressed "[a]t what point in the decommissioning process will an offshore oil and gas platform cease to be a 'stationary source' subject to air district permitting authority?" This analysis referred to each APCD's definition of "stationary source" and stated:

> Generally, an offshore oil and gas platform will remain an active stationary source subject to air district permitting authority through the completion of all activities related to the platform decommissioning and dismantling process. This includes well plugging and abandonment, topsides removal, and platform jacket structure removal. Once the platform jacket structure is removed (or is left in place as part of an authorized rigs-to-reef program), the stationary source ceases to exist.

APCD Guidance at 2.

The Chevron Letter, asserts that Chevron can perform "Pre-Abandonment and Abandonment" work (well plugging and abandonment, removing equipment from service, and topside platform preparation for removal of topside modules) at the Platforms under the existing operating permits. At the completion of the Pre-Abandonment and Abandonment phase, according to Chevron, all pollutant-emitting equipment and all potential emission sources on the stationary platforms will be removed from service and permanently rendered incapable of operating. Chevron contends that upon completion of the Pre-Abandonment and Abandonment phases it can surrender the Platforms' existing operating permits and will not require any additional permits because, having no emissions and no potential to emit any air pollutants, the Platforms no longer satisfy one of the necessary criteria to be considered an OCS Source in the definitions at CAA Section 328(a)(4)(C) and 40 C.F.R. 55.2. Chevron states that:

> Congress did not include any language that would effectively establish a "once in always in" policy to extend EPA's regulatory authority over an OCS source that no longer has the potential to emit. Nor is there any support in the statute or regulation to conclude that a source's potential to emit is only relevant to the initial determination of when the source becomes an "OCS source." Under a plain reading of Section 328 of the CAA, such equipment, facility, or activity must always emit or have the potential to emit any air pollutant in order to meet the first criterion of the OCS source definition. Thus, once Platforms Gail and Grace no longer have the potential to emit, they cannot be OCS sources. And, if these platforms are not OCS sources, they cannot be subject to any OCS permitting requirements.

Chevron Letter at 5.

Chevron buttresses its assertion that there is no "once in always in" policy regarding OCS source status by citing a series of Environmental Appeals Board (EAB) opinions from appeals of OCS permits issued by EPA Region 10. In the *Shell Discoverer* series of cases, the EAB examined when a drillship became an OCS Source and when it ceased to be an OCS Source on the basis of when it was "attached to the seabed and erected thereon." *In Re: Shell Gulf of Mexico, Inc., Shell Offshore, Inc.* (Frontier Discoverer Drilling Unit), 15 E.A.D. 470 (EAB Jan. 12, 2012); *see also In Re: Shell Gulf of Mexico, Inc., Shell Offshore, Inc.* (Frontier Discoverer Drilling Unit), 15 E.A.D. 103 (EAB Dec. 30, 2010). Chevron states that "[t]he critical concept is that the support vessel emissions are only direct emissions of an OCS source when there is an OCS source to which they can be attributed. In the scenario presented by this request, Platforms Gail and Grace will have ceased to be OCS sources before the support vessels are used to perform subsequent phases of decommissioning." Chevron Letter at 5.

**Discussion**

Under the specific circumstances described in the Chevron Letter, EPA agrees with Chevron that the Platforms would cease to be OCS sources after the Pre-Abandonment and Abandonment phases described by Chevron, and, therefore, would no longer subject to requirements applicable to OCS sources. The primary question is whether the Platforms cease to be OCS sources when the equipment on the Platforms do not emit or have the potential to emit any air pollutants.

Chevron has indicated its intent to surrender its operating permits at the completion of the Pre-Abandonment and Abandonment decommissioning stage. Chevron has stated that at this time the Platforms will have no emissions or potential to emit going forward. As discussed herein, EPA has previously determined that a facility that once was an OCS source can cease to be an OCS source when definitional criteria are no longer met. Additionally, under the specific circumstances described in the Chevron Letter, EPA concludes that associated vessel emissions alone are not sufficient to satisfy the potential to emit criteria of the OCS source definition. To determine that the Platforms continue to be OCS Sources at this stage of decommissioning, despite having surrendered their operating permits and having no emissions or potential to emit any air pollutants, EPA would need to determine that the associated vessel emissions alone suffice for the Platforms to meet the OCS Source definition. Nothing in the statute or 40 C.F.R. Part 55 supports such an interpretation.

Section 328(a)(4)(C) identifies three criteria each of which must be met for "any equipment, activity, or facility" to be considered an OCS source. The last criterion is clearly satisfied with regard to the Platforms because they continue to be located on the OCS. EPA does not administer Outer Continental Shelf Lands Act (OCSLA), but the BSEE directive to decommission the Platforms suggests that they continue to be regulated under OCSLA and thus meet the second criterion. Therefore, the criterion in Section 328(a)(4)(C) germane to this determination is whether the Platforms "emit[] or ha[ve] the potential to emit any air pollutant." Section 328(a)(4)(C) of the CAA further states that "[f]or purposes of this subsection, emissions from any vessel *servicing or associated with an OCS source*, including emissions while at the OCS source or en route to or from the OCS source within 25 miles of the OCS source, shall be considered direct emissions from *the OCS source*" (emphasis

added). This sentence in the definition of OCS source draws a clear distinction between the OCS source and any vessel servicing or associated with that source. Thus, the vessels in this context are not the OCS source, and the emissions from these types of vessels are not deemed to be emissions from an OCS source if there is no longer an OCS source present. For a vessel to service or associate with an OCS source, there must be equipment, an activity, or a facility that meets the three established defined OCS source criteria independent of such vessel.

In this instance, support vessel emissions that occur following the Pre-Abandonment and Abandonment phases at Platforms Gail and Grace cannot suffice as the potential to emit necessary for the Platforms to be considered OCS Sources because these vessels will not be associated with an OCS Source. The Platforms themselves will no longer meet the "emit or potential to emit" criteria if Chevron has removed the polluting-emitting equipment, rendered it incapable of emitting, and surrendered the operating permits for this equipment. Although a vessel may independently become an OCS source if it exhibits the characteristics of a stationary source by attaching to the seabed and erecting thereon for the purpose of exploring, developing or producing resources, the circumstances presented here do not suggest these criteria will be met by any of the vessels employed by Chevron to decommission the Platforms.

Further, the EPA agrees that the EAB decisions cited in the Chevron Letter demonstrate that a facility that previously was considered an OCS source can cease to be an OCS source when the definitional criteria are no longer met. *See In Re: Shell Gulf of Mexico, Inc., Shell Offshore, Inc*, 15 E.A.D. 470 (EAB Jan. 12, 2012); *see also In Re: Shell Gulf of Mexico, Inc., Shell Offshore, Inc.*, 15 E.A.D. 103 (EAB Dec. 30, 2010). These decisions focused on when an anchored drillship is considered an OCS source based on the criteria in the regulatory definition of OCS source in 40 C.F.R. 55.2 specific to vessels ("temporarily attached to the seabed and erected thereon and used for the purpose of exploring, developing or producing resources therefrom"). These cases establish that a drillship can be considered an OCS source when meeting the definitional criteria in 40 C.F.R. 55.2, and, subsequently, cease to be considered an OCS source when no longer meeting the specific facet of the OCS source definition. It follows that when another

facet of the same definition (potential to emit) is no longer met, a facility being treated as an OCS source would likewise cease to be an OCS source.

Finally, the APCD Guidance addresses a similar, yet distinct, question from that discussed in this letter. This determination addresses whether under the specific circumstances described herein do the Platforms cease to be OCS sources as defined in Section 328 of CAA and 40 C.F.R. Part 55? The APCD Guidance does not analyze section 328 of the CAA or the Part 55 regulations. Rather, the APCD Guidance interprets the APCDs' definitions of "stationary source" that govern whether a source requires a construction or operating permit under the NSR and Title V permitting programs that apply in these jurisdictions. These are requirements of the COA that apply off the coast of California to OCS sources within 25 miles of the state seaward boundary in accordance with section 328(a)(1) of the CAA and 40 C.F.R. 55.14. As an agency with delegated authority to implement and enforce 40 C.F.R. Part 55 for OCS sources within 25 miles when designated as the COA, Ventura County APCD has the authority to apply its NSR and Title V permitting requirements to OCS sources under the federal Part 55 regulation. However, if the Platforms cease to be OCS sources, then the part 55 regulations would no longer apply, and, thus, the incorporated COA requirements in the Ventura County APCD regulations would also cease to apply through this mechanism. Thus, the applicability of these state permitting programs to OCS sources is secondary to the question that the Chevron Letter asks EPA to address.

Sincerely,

Karl Moor
Deputy Assistant Administrator
for the Office of Air and Radiation
(OAR)