No. 21-71132

In The

# United States Court of Appeals
# for the Ninth Circuit

CHEVRON U.S.A. INC.,

Petitioner,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

Respondent.

On Petition for Review of an Order
of the Environmental Protection Agency

## BRIEF FOR PETITIONER

ASHLEY C. PARRISH
ILANA SALTZBART
KING & SPALDING LLP
1700 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
(202) 737-0500

I. CASON HEWGLEY IV
KING & SPALDING LLP
1100 Louisiana Street
Suite 4100
Houston, TX 77002
(713) 751-3200

CATHERINE E. STETSON
SEAN MAROTTA
DANIELLE DESAULNIERS STEMPEL
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
cate.stetson@hoganlovells.com

*Counsel for Chevron U.S.A. Inc.*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), Petitioner Chevron U.S.A. Inc. is wholly owned by Chevron U.S.A. Holdings Inc., which is in turn wholly owned by Texaco Inc., which is in turn wholly owned by Chevron Investments Inc., which is in turn wholly owned by Chevron Corporation, a publicly traded company (NYSE: CVX).

**TABLE OF CONTENTS**

Page

CORPORATE DISCLOSURE STATEMENT ..........................................................i

TABLE OF AUTHORITIES .......................................................................iv

GLOSSARY................................................................................... xiii

JURISDICTIONAL STATEMENT ................................................................1

INTRODUCTION ..............................................................................2

ISSUES PRESENTED FOR REVIEW ..........................................................5

STATUTES AND REGULATIONS ..............................................................5

STATEMENT OF THE CASE...................................................................5

      A.     Statutory Background.......................................................5

      B.     EPA's Interpretations Of The OCS Source Definition ..................11

      C.     Chevron's Petition for Review....................................14

SUMMARY OF ARGUMENT ..................................................................15

STANDARD OF REVIEW .....................................................................19

ARGUMENT ..................................................................................20

    I.    CHEVRON'S CHALLENGE IS FIT FOR JUDICIAL
       REVIEW ..........................................................................21

      A.     The April Letter is Final Agency Action ......................................21

      B.     Chevron's Challenge To The April Letter Is Ripe........................31

    II.   EPA'S APRIL LETTER IS CONTRARY TO THE CLEAN
       AIR ACT AND THE AGENCY'S REGULATIONS ..............................35

      A.     A Platform Is Not An OCS Source After It No Longer
           Has The Potential To Emit, Regardless Of Other
           Activities That Take Place During Decommissioning ..................36

Page

1. *Section 328's text does not permit EPA to regulate decommissioning after a platform ceases to emit* ...................................................................36

2. *EPA's contrary interpretation of § 328 does not warrant deference* .............................................44

B. EPA Lacks Authority Under Its Own Regulations To Regulate Decommissioning After A Platform Can No Longer Emit ..........................................................................49

1. *40 C.F.R. § 55.2 does not permit EPA to regulate decommissioning after a platform ceases to emit* ...................................................................49

2. *EPA's Interpretation of OCS Source in 40 C.F.R. § 55.2 is not entitled to* Auer *or* Skidmore *deference* ...........................................................51

III. EPA'S APRIL LETTER IMPERMISSIBLY DELEGATES INTERPRETIVE AUTHORITY TO THE LOCAL DISTRICT ..........................................................................53

CONCLUSION ................................................................................57

CERTIFICATE OF COMPLIANCE

ADDENDUM

CERTIFICATE OF SERVICE

**CASES:**

*Alaska Dep't of Env't Conservation v. EPA,*
540 U.S. 461 (2004)........................................................................19

*Alaska, Dep't of Env't Conservation v. EPA,*
244 F.3d 748 (9th Cir. 2001) ..........................................................23

*American Bird Conservancy v. FCC,*
545 F.3d 1190 (9th Cir. 2008) .........................................................26

*Arteaga-De Alvarez v. Holder,*
704 F.3d 730 (9th Cir. 2012) ...........................................................48

*Assiniboine & Sioux Tribes of Fort Peck Indian Rsrv. v. Board of Oil
& Gas Conservation of Montana,*
792 F.2d 782 (9th Cir. 1986) ................................................54, 56

*Auer v. Robbins,*
519 U.S. 452 (1997)...........................................20, 36, 51, 52

*Avendano-Ramirez v. Ashcroft,*
365 F.3d 813 (9th Cir. 2004) ...........................................................43

*Barnhart v. Sigmon Coal Co.,*
534 U.S. 438 (2002)........................................................................53

*BedRoc Ltd., LLC v. United States,*
541 U.S. 176 (2004)........................................................................36

*Bennett v. Spear,*
520 U.S. 154 (1997)...................................................................*passim*

*California Cmtys. Against Toxics v. EPA,*
934 F.3d 627 (D.C. Cir. 2019)........................................................26

*Center for Biological Diversity v. Kempthorne,*
588 F.3d 701 (9th Cir. 2009) ..........................................................33

Page

*Chevron U.S.A. Inc. v. EPA*,
45 F.4th 380 (D.C. Cir. 2022)....................................................1, 14, 15

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*,
467 U.S. 837 (1984)....................................................................*passim*

*Choin v. Mukasey*,
537 F.3d 1116 (9th Cir. 2008) ...........................................................48

*Christopher v. SmithKline Beecham Corp.*,
567 U.S. 142 (2012)....................................................20, 51, 52

*City of Fremont v. FERC*,
336 F.3d 910 (9th Cir. 2003) ...........................................................28

*CSI Aviation Servs., Inc. v. U.S. Dep't of Transp.*,
637 F.3d 408 (D.C. Cir. 2011)...........................................................30

*Diaz-Quirazco v. Barr*,
931 F.3d 830 (9th Cir. 2019) ...........................................................45

*Eagle-Picher Indus., Inc. v. EPA*,
759 F.2d 905 (D.C. Cir. 1985)...........................................................34

*Encino Motorcars, LLC v. Navarro*,
136 S. Ct. 2117 (2016).........................................18, 44, 46, 47

*Energy Future Coal. v. EPA*,
793 F.3d 141 (D.C. Cir. 2015)...........................................................33

*Environmental Def. Ctr. v. Bureau of Ocean Energy Mgmt.*,
36 F.4th 850 (9th Cir. 2022) ...........................................................28

*Epic Sys. Corp. v. Lewis*,
138 S. Ct. 1612 (2018)........................................................19, 46

*Fairbanks N. Star Borough v. U.S. Army Corps of Eng'rs*,
543 F.3d 586 (9th Cir. 2008) ...........................................................26

Page

*Fogo De Chao (Holdings) Inc. v. U.S. Dep't of Homeland Sec.*,
769 F.3d 1127 (D.C. Cir. 2014) .................................................................47

*Frankl v. HTH Corp.*,
650 F.3d 1334 (9th Cir. 2011) ..............................................................53, 55

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) .................................................................................27

*Frozen Food Express v. United States*,
351 U.S. 40 (1956) ....................................................................................24

*Gill v. U.S. Dep't of Just.*,
913 F.3d 1179 (9th Cir. 2019) ..............................................................22, 49

*Hearth, Patio & Barbecue Ass'n v. EPA*,
11 F.4th 791 (D.C. Cir. 2021) ................................................................34, 35

*Industrial Customers of Nw. Utils. v. Bonneville Power Admin.*,
408 F.3d 638 (9th Cir. 2005) .....................................................................26

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab.
Litig.*,
959 F.3d 1201 (9th Cir. 2020) ...................................................................56

*Kisor v. Wilkie*,
139 S. Ct. 2400 (2019).................................................................20, 36, 45, 52

*Long Island Care at Home, Ltd. v. Coke*,
551 U.S. 158 (2007).................................................................................52

*Los Angeles Haven Hospice, Inc. v. Sebelius*,
638 F.3d 644 (9th Cir. 2011) .....................................................................31

*MacClarence v. EPA*,
596 F.3d 1123 (9th Cir. 2010) ..............................................................54, 56

*Martin v. Occupational Safety & Health Rev. Comm'n*,
499 U.S. 144 (1991)..................................................................................45

Page

*McMaster v. United States*,
731 F.3d 881 (9th Cir. 2013) ...................................................48

*Miller v. Sessions*,
889 F.3d 998 (9th Cir. 2018) ...................................................48

*Molloy v. Metropolitan Transp. Auth.*,
94 F.3d 808 (2d Cir. 1996) .....................................................41

*Montana Shooting Sports Ass'n v. Holder*,
727 F.3d 975 (9th Cir. 2013) ...................................................32

*National Park Hosp. Ass'n v. Department of Interior*,
538 U.S. 803 (2003).............................................................35

*Natural Res. Def. Council, Inc. v. EPA*,
22 F.3d 1125 (D.C. Cir. 1994)..................................................34

*Navajo Nation v. U.S. Dep't of Interior*,
819 F.3d 1084 (9th Cir. 2016)..................................................23

*NLRB v. SW Gen., Inc.*,
137 S. Ct. 929 (2017)...........................................................50

*Northern California River Watch v. Wilcox*,
633 F.3d 766 (9th Cir. 2011) ...................................................45

*Northern Plains Res. Council v. Fidelity Expl. & Dev. Co.*,
325 F.3d 1155 (9th Cir. 2003) ..................................................53

*Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*,
465 F.3d 977 (9th Cir. 2006) ...............................................29, 30

*Padash v. INS*,
358 F.3d 1161 (9th Cir. 2004) ..................................................47

*Post v. St. Paul Travelers Ins. Co.*,
691 F.3d 500 (3d Cir. 2012) ....................................................41

Page

*Reno v. Koray*,
515 U.S. 50 (1995) ..................................................................49

*Rivera v. Lynch*,
816 F.3d 1064 (9th Cir. 2016) ...............................................49

*Riverside Cement Co. v. Thomas*,
843 F.2d 1246 (9th Cir. 1988) ...............................................56

*Sackett v. EPA*,
566 U.S. 120 (2012) ..........................................................23, 29

*Safer Chems., Healthy Fams. v. EPA*,
943 F.3d 397 (9th Cir. 2019) ............................................31, 34

*San Francisco Herring Ass'n v. U.S. Dep't of the Interior*,
946 F.3d 564 (9th Cir. 2019) ..................................................29

*SEC v. Chenery Corp.*,
332 U.S. 194 (1947) ................................................................45

*Skidmore v. Swift & Co.*,
323 U.S. 134 (1944) ...................................................... <i>passim</i>

*Southern Pac. Transp. Co. v. Watt*,
700 F.2d 550 (9th Cir. 1983) ............................................53, 54

*Sung Kil Jang v. Lynch*,
812 F.3d 1187 (9th Cir. 2015) ...............................................19

*TSG Inc. v. EPA*,
538 F.3d 264 (3d Cir. 2008) ..................................................22

*Ukiah Valley Med. Ctr. v. FTC*,
911 F.2d 261 (9th Cir. 1990) .................................................33

*United States v. Emerson*,
846 F.2d 541 (9th Cir. 1988) .................................................54

Page

*United States v. Mead Corp.*,
533 U.S. 218 (2001) ...................................................................47, 49

*United States v. Philip Morris USA Inc.*,
396 F.3d 1190 (D.C. Cir. 2005) ...........................................................41

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
578 U.S. 590 (2016) ...............................................24, 25, 28, 30

*U.S. Telecom Ass'n v. FCC*,
359 F.3d 554 (D.C. Cir. 2004) ...................................................53, 56

*Utility Air Regul. Grp. v. EPA*,
573 U.S. 302 (2014) ...........................................................................19

*Washington State Dep't of Soc. & Health Servs. v. Guardianship Est.
of Keffeler*,
537 U.S. 371 (2003) ...................................................................40, 41

*Whitman v. American Trucking Ass'ns*,
531 U.S. 457 (2001) ...............................................21, 32, 34, 35

*WildEarth Guardians v. EPA*,
759 F.3d 1064 (9th Cir. 2014) ..........................................................56

*Wolfson v. Brammer*,
616 F.3d 1045 (9th Cir. 2010) ...................................................33, 35

**STATUTES:**

5 U.S.C. § 551(6) ...............................................................................21

5 U.S.C. § 551(13) .............................................................................21

5 U.S.C. § 706(2)(A) ..........................................................................19

42 U.S.C. § 2286a(b)(1) .....................................................................42

42 U.S.C. § 7407(a) ............................................................................54

42 U.S.C. § 7411(a) .............................................................................7

Page

42 U.S.C. § 7411(e) ......................................................................................7

42 U.S.C. § 7412(*l*)(1) ...............................................................................54

42 U.S.C. § 7413(b) ......................................................................................7

42 U.S.C. § 7601 *et seq.* ...........................................................................11

42 U.S.C. § 7607(b) ..............................................................................34, 35

42 U.S.C. § 7607(b)(1) .......................................................................1, 21, 34

42 U.S.C. § 7627(a)(1) ...................................................................6, 7, 29, 54

42 U.S.C. § 7627(a)(3) ....................................................................7, 19, 54

42 U.S.C. § 7627(a)(4)(C) ..................................................................*passim*

42 U.S.C. § 7627(a)(4)(D) ..............................................................................7

42 U.S.C. §§ 7661-7661f .............................................................................43

42 U.S.C. § 10137(a)(1) ...............................................................................42

42 U.S.C. § 17373(b)(7)(A) .........................................................................43

43 U.S.C. § 1331(a) ......................................................................................6

43 U.S.C. § 1333(a)(1) .................................................................................39

43 U.S.C. § 1333(a)(1)(A)(iii) ......................................................................8

43 U.S.C. § 1333(a)(1)(B) .............................................................................8

43 U.S.C. § 1337(b)(4) ...................................................................................8

Clean Air Act Amendments of 1990, Pub. L. No. 101-549, 104 Stat. 2399 .............5

**REGULATIONS:**

30 C.F.R. § 250.1700(a) ...........................................................................8, 41

30 C.F.R. § 585.112 ...................................................................................41

40 C.F.R. § 55.2 ....................................................................................*passim*

40 C.F.R. § 55.3(b) ....................................................................................11

40 C.F.R. § 55.6 .........................................................................................6

40 C.F.R. § 55.6(c) .............................................................................7, 11, 29

40 C.F.R. § 71.4(d) ..................................................................................43

40 C.F.R. Part 55 .......................................................................................11

40 C.F.R. Part 1042 .....................................................................................7

40 C.F.R. Part 1043 .....................................................................................7

40 C.F.R. Part 1045 .....................................................................................7

**OTHER AUTHORITIES:**

American Heritage Dictionary (2d coll. ed. 1985):
    *Construct* ............................................................................................40
    *Develop* ..............................................................................................40
    *Produce* ..............................................................................................40

EPA, *Ventura County APCD Agreement for Delegation of Authority for Outer Continental Shelf Air Regulations (40 CFR Part 55)* (Jan. 27, 1994) .......................................................................................11, 55

Interagency Decommissioning Working Grp., *A Citizen's Guide to Offshore Oil and Gas Decommissioning in Federal Waters Off California* (2019) ...................................................................................42

*New Source Review (NSR) Permitting*, EPA, https://tinyurl.com/4jbh6wvh (last updated Oct. 7, 2022)................................27

Page

*New Source Review (NSR) Permitting: Additional Environmental
Protection Agency (EPA) Views on Outer Continental Shelf
Decommissioning Activities at the Chevron U.S.A. Inc. Gail and
Grace Platforms*, EPA, https://tinyurl.com/mw49antf (last updated
June 17, 2022) ...................................................................................................27

Oil and Gas Dictionary (1988) .........................................................................40

*The Basics of Offshore Oil & Gas*, Nat'l Ocean Indus. Ass'n,
https://tinyurl.com/yut72umz (last visited Nov. 2, 2022) ..................................40

TSB Offshore, Inc., *A Study for the Bureau of Safety and
Environmental Enforcement: Decommissioning Cost Update for
Pacific OCS Region Facilities Vol. I* (rev. 3, Feb. 2015) ...........................8, 9, 30

Ventura Cnty. Air Pollution Control Dist., *Part 70 Permit No. 1493*,
*available at* http://www.vcapcd.org/pubs/Engineering/permits2000/
TitleV2000/current/TV-PO-No-01493-451-461-471-481-May-01-
2018.pdf ..........................................................................................................30

Ventura Cnty. Air Pollution Control Dist., *Part 70 Permit No. 1494*,
*available at* http://www.vcapcd.org/pubs/Engineering/permits2000/
TitleV2000/current/TV-PO-No-01494-581-Final-2022-08-17.pdf....................30

# GLOSSARY

| | |
|---|---|
| Chevron: | Chevron U.S.A. Inc. |
| EPA or the Agency: | Environmental Protection Agency |
| OCS: | Outer Continental Shelf |
| OCSLA: | Outer Continental Shelf Lands Act |
| Ventura County: | Ventura County Air Pollution Control District |

# United States Court of Appeals for the Ninth Circuit

No. 21-71132

CHEVRON U.S.A. INC.,

Petitioner,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

Respondent.

On Petition for Review of an Order
of the Environmental Protection Agency

**BRIEF FOR PETITIONER**

**JURISDICTIONAL STATEMENT**

Chevron U.S.A. Inc. (Chevron) timely filed its petition for review on June 18, 2021, within 60 days of the Environmental Protection Agency (EPA)'s challenged decision. 42 U.S.C. § 7607(b)(1). Venue lies in this Court under 42 U.S.C. § 7607(b)(1) because EPA's decision is "locally or regionally applicable." *Chevron U.S.A. Inc. v. EPA*, 45 F.4th 380 (D.C. Cir. 2022).

# INTRODUCTION

This case raises a straightforward question of statutory interpretation. Section 328 of the Clean Air Act authorizes EPA to regulate emissions from stationary sources located on the Outer Continental Shelf (OCS), which the Act defines narrowly as "any equipment, activity, or facility" that (1) "emits or has the potential to emit any air pollutant," (2) "is regulated or authorized under the Outer Continental Shelf Lands Act" (OCSLA), and (3) is located on the OCS. 42 U.S.C. § 7627(a)(4)(C). When an oil and gas platform located on the OCS reaches the end of its productive life, it undergoes a process known as "decommissioning." Decommissioning costs millions and takes years. Chevron is preparing to decommission two platforms located on the OCS, offshore of Ventura County, California. To clarify its obligations, Chevron asked EPA whether a platform in the process of being decommissioned stops being an OCS source when it is no longer emitting and lacks the potential to emit.

In January 2021, EPA answered "yes." The Agency explained that, under the statute, once a platform no longer emits or has the potential to emit, it no longer qualifies as an OCS source. EPA reached that conclusion even though it recognized that mobile vessels involved in dismantling the platform would continue to emit as part of the decommissioning process; under the Clean Air Act

and EPA's regulations, emissions from such vessels are attributable to the platform only if the platform *independently* qualifies as an OCS source.

EPA reversed course in April 2021. EPA's new position is that a platform that ceases to emit might nevertheless remain an OCS source depending on what "additional activity" may be "conducted at the site" and what equipment might be "used to dismantle" the platform as part of the decommissioning process. ER-5. EPA's April Letter did not explain what activity could be attributed to the platform, as opposed to vessels servicing the platform. EPA then purported to delegate to Ventura County officials its authority to interpret the Clean Air Act and determine when a platform that is no longer emitting *does* cease to be an OCS source.

EPA's newfound interpretation exceeds its authority under the Clean Air Act. EPA's view that a platform that is no longer emitting can nevertheless qualify as an OCS source has no basis in § 328's text, the Clean Air Act's structure, or EPA's own regulations. A platform that cannot emit air pollutants cannot be an OCS source of pollutants, full stop. The presence—or absence—of a vessel conducting additional activity "at the site" of the platform as part of the decommissioning process cannot change that conclusion. To hold otherwise would contravene the Clean Air Act's fundamental distinction between stationary and mobile sources.

3

Allowing EPA to regulate emissions associated with the decommissioning process would exceed its statutory authority for another reason: Congress in § 328 limited EPA to regulating emissions associated with the productive use of natural resources; decommissioning is the opposite. EPA's attempt to delegate its interpretive authority to local officials likewise exceeds its power, as Congress authorized EPA to delegate only implementation and enforcement of the Clean Air Act—not interpretation.

Without much to say on the merits, EPA has thus far cast about for various ways to dismiss Chevron's challenge at the threshold. These arguments boil down to the idea that because EPA purported to delegate a follow-on interpretive decision to Ventura County, judicial review of EPA's interpretation of § 328 and its delegation to Ventura County would be premature. EPA's bid to evade judicial review through an unlawful delegation falls flat. The April Letter is final agency action—both standing alone and because it superseded the January Letter—because it marked the end of the Agency's (renewed) consideration of Chevron's interpretative question and carried with it legal consequences. These same foundational principles also demonstrate that Chevron's petition is ripe. The Court should accordingly vacate EPA's erroneous interpretation of § 328.

<h1 style="text-align:center">ISSUES PRESENTED FOR REVIEW</h1>

1.     Whether an oil platform that no longer emits air pollutants and no longer has the potential to emit air pollutants nevertheless qualifies as an OCS source under Clean Air Act § 328(a)(4)(C) or 40 C.F.R. § 55.2, which both define an OCS source as a stationary source that is emitting or has the potential to emit air pollutants.

2.     Whether EPA impermissibly delegated the power to interpret Clean Air Act § 328 to the local permitting district, where the statute permits EPA to delegate only the authority to "implement and enforce" requirements related to the regulation of OCS sources within 25 miles of land.

<h1 style="text-align:center">STATUTES AND REGULATIONS</h1>

Pertinent statutes and regulations are reprinted in the Addendum.

<h1 style="text-align:center">STATEMENT OF THE CASE</h1>

**A.     Statutory Background.**

***The Clean Air Act and OCS Sources.***  The Clean Air Act establishes a comprehensive emissions-control regime.  One of the Act's most fundamental distinctions is between stationary and mobile sources: Title I regulates stationary sources; Title II governs mobile sources, including vessels.  Clean Air Act Amendments of 1990, Pub. L. No. 101-549, 104 Stat. 2399, 2399, 2471.  EPA "is prohibited from directly regulating mobile sources" under Title I.  ER-103-104.

5

In 1990, Congress extended EPA's Clean Air Act jurisdiction to include stationary sources on certain parts of the OCS. 42 U.S.C. § 7627(a)(1) (instructing EPA "to control air pollution from Outer Continental Shelf sources located offshore of the States along the Pacific, Arctic and Atlantic Coasts"). The OCS includes "all submerged lands lying seaward and outside of the area of lands beneath navigable waters . . . , and of which the subsoil and seabed appertain to the United States and are subject to its jurisdiction and control." 43 U.S.C. § 1331(a). To define (and confine) EPA's authority under this provision, Congress carefully identified what qualifies as an "OCS source": "any equipment, activity, or facility" that (1) "emits or has the potential to emit any air pollutant," (2) "is regulated or authorized under" OCSLA, and (3) is located on the OCS. 42 U.S.C. § 7627(a)(4)(C). The "activities" referenced in § 328 "include, but are not limited to, platform and drill ship exploration, construction, development, production, processing, and transportation." *Id.* EPA's regulations similarly provide that, to qualify as an OCS source, the "equipment, activity, or facility" must meet the statute's three requirements. 40 C.F.R. § 55.2.

A determination that equipment, an activity, or a facility qualifies as an OCS source has significant legal consequences. An OCS source must apply for permits consistent with EPA's OCS Air Regulations. *See generally* 40 C.F.R. § 55.6. In addition, "[e]ach State adjacent to an OCS source . . . may promulgate and submit

to the Administrator regulations for implementing and enforcing the requirements of" § 328.  42 U.S.C.A. § 7627(a)(3).  If EPA deems those regulations adequate, EPA "shall delegate" its implementation and enforcement powers to that State.  *Id.*  An OCS source "located within 25 miles of the seaward boundary of [a] State[ ]" must abide by any state and local permitting requirements that "would be applicable if the source were located in the corresponding onshore area."  *Id.* § 7627(a)(1); *see* 40 C.F.R. § 55.6(c).  Failure to adhere to these requirements exposes the OCS source-operator to significant penalties.  *See* 42 U.S.C. §§ 7627(a)(1), 7411(e), 7413(b).

Consistent with the Clean Air Act's divide between stationary and mobile sources, Congress authorized EPA to regulate only stationary sources on the OCS. *See id.* §§ 7627(a)(1), 7627(a)(4)(D), 7411(a).  A vessel therefore cannot independently qualify as an OCS source unless it is stationary, meaning "[p]ermanently or temporarily attached to the seabed and erected thereon and used for the purpose of exploring, developing or producing resources therefrom."  40 C.F.R. § 55.2.[1]  And although a mobile vessel is subject to extensive regulation, *see, e.g.*, 40 C.F.R. Parts 1042, 1043, 1045, EPA may regulate a vessel's emissions

---

[1] A vessel also qualifies as an OCS source when it is "[p]hysically attached to an OCS facility," such that it "will be considered a part of that facility."  40 C.F.R § 55.2; ER-103.  In that scenario, "[o]nly the vessel's stationary source activities may be regulated, since when vessels are in transit, they are specifically excluded from the definition of OCS source by statute."  ER-103; *see* 40 C.F.R. § 55.2.

under § 328 only when the vessel is "servicing or associated with an OCS source," such that the vessel's emissions may "be considered direct emissions from the OCS source." 42 U.S.C. § 7627(a)(4)(C).

Clean Air Act § 328 mirrors OCSLA, which grants the federal government jurisdiction over only "installations and other devices permanently or temporarily attached to the [OCS] seabed, which may be erected thereon for the purpose of exploring for, developing, or producing resources." 43 U.S.C. § 1333(a)(1)(A)(iii). OCSLA governs the process by which an operator may lease the right to attach an offshore platform to the OCS seabed "for the purpose of exploring for, developing, or producing resources." *Id.*; *see id.* § 1333(a)(1)(B). A lease "entitle[s] the lessee to explore, develop, and produce the oil and gas contained within the lease area" for a designated period of time. *Id.* § 1337(b)(4).

*Decommissioning.* All leases—and offshore platforms—eventually come to an end. The process of an operator ending extraction operations, removing associated equipment, and returning the lease to a satisfactory condition is known as "decommissioning." 30 C.F.R. § 250.1700(a).

Decommissioning proceeds in six phases, can take years, and is extremely costly. *See* ER-70, ER-74; TSB Offshore, Inc., *A Study for the Bureau of Safety and Environmental Enforcement: Decommissioning Cost Update for Pacific OCS Region Facilities Vol. I*, at 1-2, tbl 1.1 (rev. 3, Feb. 2015) (estimating that it would

cost an average of $63 million to decommission one platform).  Before even beginning decommissioning, the platform operator must obtain various approvals and permits.  That process alone can run three to five years.  *Decommissioning Cost Update*, *supra*, at 7-2.

The platform operator then begins the first phase of decommissioning, known as pre-abandonment and abandonment.  During this phase, the operator plugs the wells supported by the platform, removes equipment from service and transports it to shore, cleans the equipment, and prepares the topside platform for decommissioning.  ER-47-50; *see* ER-15 (describing this process as "Pre-Abandonment and Abandonment"); ER-10 (same).  Some of these activities are "conducted while the platform is still operational."  ER-49.  The pre-abandonment and abandonment stages of decommissioning require the use of various equipment, including a compressor, the platform crane, generators, welding machines, crew and supply boats, a dive boat and dive compressors, mechanical cutters, and cargo barges.  ER-63-64; *see* ER-72 (summarizing equipment required at each decommissioning phase).  At the end of pre-abandonment and abandonment, all pollutant-emitting equipment on the platform has been removed from service and rendered inoperable.  *See* ER-15.

The remaining phases of decommissioning are performed using mobile vessels.  In the second phase, the platform operator removes and disposes of the

topside, the above-water portion of the platform.  During topside removal, a derrick barge—a flat-bottomed boat fitted with a crane and capable of lifting over 500 tons—travels to the platform and removes the topside, placing it on a cargo barge.  ER-50-51.  "Derrick barges are equipped with large diesel-powered generators that supply electricity to a range of equipment on the derrick barge, including cranes [and] welders," among other things.  ER-68.  They are primarily located outside the United States and either travel under their own power or are pulled by tugboats to platforms.  *Id.*  Derrick barges and cargo barges are also used in the third phase—jacket removal—to remove and transport the jacket, the steel frame that supports the deck and topside.  ER-52-53.  Depending on their size and the derrick barge's capacity, the topside and jacket may be dismantled and removed piecemeal or in full.  ER-51-53.

In the fourth stage—debris removal—the operator dredges the seafloor from a barge to remove accumulated marine life; transports the cargo barges, equipment, and crew back to the shore; and ensures the area is "free of obstructions that would interfere with other uses of the OCS, such as commercial fishing and trawling operations."  ER-54-56.  In the fifth stage, the operator cleans, disconnects, and plugs the pipeline; removes the pipeline (if necessary) using a dive crew and barge; and cuts, removes, and transports the power cables to shore.  ER-56-57.  Finally, the platform operator transports the various dismantled components to shore,

offloads them, transports them by vehicle to other onshore locations, and disposes of the materials.  ER-57-58.

Neither the Clean Air Act nor EPA's OCS Air Regulations discuss the decommissioning process.  *See generally* 42 U.S.C. § 7601 *et seq.*; 40 C.F.R. Part 55.  But Ventura County, the local permitting agency, instructs that, for pre-abandonment and abandonment, the platform operator should use its existing Clean Air Act Title V "permits to the extent possible."  ER-98; *see* 40 C.F.R. §§ 55.3(b), 55.6(c).[2]  If the platform continues to qualify as an OCS source in subsequent phases, the platform "operator will need to obtain a new . . . permit."  ER-99.  "Given the logistics of mobilizing for such a large project, operators are advised to contact the air district well in advance to discuss the permitting requirements and to build in at least 12–18 months to obtain the required permits."  *Id.*

## B.     EPA's Interpretations Of The OCS Source Definition.

Over the years, Chevron has operated platforms in several locations off the United States coastline, including two—the Grace and Gail platforms—located on

---

[2] In 1994, EPA and Ventura County entered into a delegation agreement, which allows Ventura County to implement and enforce the Clean Air Act's requirements for OCS sources located within 25 miles of California's seaward boundary.  *See* EPA, *Ventura County APCD Agreement for Delegation of Authority for Outer Continental Shelf Air Regulations (40 CFR Part 55)*, at 1 (Jan. 27, 1994).  The delegation agreement requires Ventura County to consult with EPA before issuing any interpretation of § 328 or EPA's OCS regulations.  *Id.* at 7.  It is unclear whether the County's Air Quality Guidance complied with that requirement.

the OCS and within 25 miles of Ventura County, California. Chevron ceased operating these platforms in 1999, at which point it sold the leases and assets to another company. Consent Mot. for Entry of Limited Stay of Order, Suspension of Proceedings and Required Report to the Board at 2, *In re Chevron U.S.A. Inc.*, IBLA-2018-__ (IBLA Mar. 5, 2018). But when Chevron's successor abandoned the leases and defaulted on its decommissioning obligations nearly two decades later, those responsibilities fell to Chevron. *See id.*

In September 2020, Chevron requested from EPA headquarters a determination regarding how Clean Air Act § 328 applied to decommissioning oil and gas platforms. ER-14. Chevron explained that, at the end of pre-abandonment and abandonment, "all pollutant-emitting equipment and all potential emissions sources" on the Gail and Grace platforms would be removed from service and rendered inoperable. ER-15. Chevron also committed "to surrender and terminate its Title V operating permits" at that stage. *Id.* After those steps, the platforms would "no longer emit or have the potential to emit any air pollutant (either physically or legally)." *Id.* Chevron's request thus asked whether an oil and gas platform that has completed the pre-abandonment and abandonment decommissioning phases "ceases to be an OCS source when it no longer has the potential to emit." ER-17.

12

EPA responded in January 2021. ER-8-13. EPA concluded that once an offshore drilling platform in the process of being decommissioned "no longer emit[s] or ha[s] the potential to emit any pollutant," as described in Chevron's letter, the platform need not comply with EPA's OCS source requirements or the regulations of the OCS source's corresponding onshore area. *Id.* That is because (1) the platform no longer qualifies as an OCS source, and (2) the vessels performing the ongoing decommissioning work are not themselves OCS sources. *Id.*

Just over three months later, in April 2021, EPA issued a new determination "supersed[ing]" the January Letter. ER-4. Although EPA purported to reaffirm its January conclusion that an OCS source ceases to be one "after all existing emissions-generating equipment is removed," ER-5, it in reality created new uncertainties and imposed new burdens on decommissioning. This time, EPA took the position that even when a platform no longer emits or has the potential to emit, it might nonetheless remain an OCS source depending on what additional activities may be conducted "at the site" and what equipment might be used to dismantle the platform. *Id.*

EPA offered two theories in support of its altered view. First, it noted that Clean Air Act § 328(a)(4)(C) defines an OCS source as activities " 'includ[ing], but . . . not limited to,' platform and drill ship exploration, construction,

development, production, processing, and transportation." ER-5-6. Because that list is "not exclusive," EPA concluded that "activities" could include "[t]he dismantling of a platform or the demolition or 'deconstruction' of such a structure." ER-6. Second, EPA asserted that a "vessel[] employed by Chevron to decommission the Platforms" during the post-abandonment decommissioning process could meet the regulatory definition of an OCS source by being "[p]ermanently or temporarily attached to the seabed and erected thereon and used for the purpose of exploring, developing or producing resources therefrom." *Id.* (internal quotation marks omitted). In either case, Chevron would have to comply with both EPA and the corresponding onshore area regulator's permitting requirements. *Id.*

EPA also declined to decide when a platform that is no longer emitting ceases to be an OCS source. *See id.* Rather, it delegated that interpretive decision to Ventura County. *Id.* Although EPA "encourag[ed]" Ventura County "to consult with [EPA] prior to making a final determination," it left the ultimate "applicability determination" to the County. *Id.*

## C.     Chevron's Petitions for Review.

Chevron petitioned for review in the D.C. Circuit on the ground that the April Letter was a nationally applicable EPA action. *See Chevron*, 45 F.4th at 384. Anticipating that EPA might contest venue, Chevron also filed a protective petition

14

in this Court. This Court placed the proceedings in abeyance pending resolution of the parallel D.C. Circuit case. Order, Dkt. No. 26 (Nov. 19, 2021).

The D.C. Circuit held that venue "lies exclusively in" this Court. *Chevron*, 45 F.4th at 384. Because venue is a "threshold, nonjurisdictional issue that can be addressed without first examining jurisdiction," the D.C. Circuit did not address EPA's other threshold finality and ripeness arguments or reach the merits. *Id.* at 385.

After the D.C. Circuit handed down its opinion, the Court removed this case from abeyance. Order, Dkt. No. 31 (Aug. 30, 2022).

## SUMMARY OF ARGUMENT

I.  Chevron's challenge to EPA's April Letter is fit for judicial review.

A.  The April Letter is final agency action. The April Letter marked "the consummation of [EPA's] decisionmaking process" and determined both "legal consequences" and Chevron's "rights or obligations" under § 328. *Bennett v. Spear*, 520 U.S. 154, 177-178 (1997) (internal quotation marks omitted). The April Letter determined that a platform does not necessarily cease to be an OCS source when it can no longer emit. There is no indication EPA will reconsider that position, which is separate and distinct from the follow-on question EPA delegated to Ventura County of when a platform that can no longer emit *does* cease to be an OCS source.

15

Moreover, by "supersed[ing]" the January Letter—which was itself final—the April Letter altered the legal regime: It rescinded the safe harbor that Chevron had under the January Letter, exposing Chevron to significant penalties if it were to follow the January Letter and surrender its permits once the platforms could no longer emit. ER-4. EPA's decision also affected Chevron's rights and obligations by requiring it to choose between complying with Ventura County's permitting requirements or risking penalties for noncompliance.

B. Chevron's challenge is ripe. As the object of EPA's administrative action, Chevron's claims are constitutionally ripe. Chevron also has standing because of the compliance burdens the April Letter imposes. Under the April Letter, Chevron cannot surrender its Title V permits at the conclusion of the pre-abandonment and abandonment phases without first engaging in a costly, time-consuming permitting process. Vacating the April Letter and restoring the January Letter's interpretation of § 328 would redress these harms.

Chevron's claims are also prudentially ripe. Chevron's petition challenges a final agency action and raises legal questions that do not require further factual development, so Chevron's petition is fit for judicial review. And although the Clean Air Act's judicial-review provision specifies a clear preference for immediate review—making the hardship prong of prudential ripeness irrelevant—

16

withholding review would cause Chevron hardship by forcing it to choose between running Ventura County's permitting gauntlet or risking serious penalties.

II. On the merits, EPA's April Letter misinterpreted Clean Air Act § 328 and exceeded its jurisdiction under that statute. An OCS source is "any equipment, activity, or facility" that "emits or has the potential to emit." 42 U.S.C. § 7627(a)(4)(C). Thus, once a platform can no longer emit and no longer has the potential to emit, it is no longer an OCS source. EPA nonetheless concluded in the April Letter that even *after* a platform can no longer emit, "additional activity conducted at the site or equipment used to dismantle" the platform could nevertheless render the platform an OCS source. ER-5.

Section 328's plain language forecloses that interpretation. When a platform that is being decommissioned can no longer emit, there is no equipment on the platform that can emit. Emissions from a stationary vessel that qualifies as an OCS source are attributable to the vessel, not the platform. And emissions from equipment associated with a mobile vessel cannot render a non-OCS-source platform an OCS source by association.

As for EPA's claim about "additional activity . . . used to dismantle" the platform, § 328 is clear that only activities associated with the productive use of offshore energy resources trigger OCS-source status. Decommissioning is the opposite; it is the process of ending operations so that the platform can no longer

17

produce energy resources.  In any event, because these decommissioning activities would be attributable to the vessels, they cannot render the *platform* an OCS source.  To hold otherwise would permit EPA to exceed its authority under the Clean Air Act to regulate only stationary sources.

EPA's contrary interpretation of § 328 does not warrant deference.  Even if the statute were ambiguous, EPA's perfunctory statutory discussion does not satisfy *Chevron*'s reasonable-explanation requirement.  *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) (*Chevron* deference is not warranted when agency fails to reasonably explain its interpretation).  And because EPA's cursory analysis is directly contrary to its conclusion in the January Letter, the April Letter does not deserve *Skidmore* deference, either.

Moreover, EPA's regulations do not permit the Agency to regulate a platform in the process of decommissioning after it ceases to emit.  40 C.F.R. § 55.2 provides that a vessel can qualify as an OCS source if it is "attached to the seabed . . . for the purpose of exploring, developing or producing resources therefrom."  Decommissioning is not mentioned.  But even if it were, emissions from that vessel would be attributable to the *vessel* as an OCS source; they would not affect the platform's status.  And because EPA's April interpretation is inconsistent with the regulation's text and contradicts the January Letter, this Court should not defer to it.

III.     Finally, the April Letter impermissibly delegated authority to interpret the Clean Air Act to Ventura County.  Congress authorized EPA to delegate to local agencies only the authority to "implement and enforce" requirements for OCS sources located within 25 miles of land.  42 U.S.C. § 7627(a)(3).  EPA here delegated its *interpretive* authority, leaving the local district to determine when a platform that is being decommissioned ceases to qualify as an OCS source.

The April Letter should be vacated.

## STANDARD OF REVIEW

This Court applies the Administrative Procedure Act's standards to Clean Air Act petitions for review.  *Alaska Dep't of Env't Conservation v. EPA*, 540 U.S. 461, 496-497 (2004).  Under the Administrative Procedure Act, the Court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

The Court reviews EPA's interpretation of the Clean Air Act through the familiar *Chevron* two-step.  *Utility Air Regul. Grp. v. EPA*, 573 U.S. 302, 315 (2014).  First, the Court examines the statute *de novo*, "applying the normal tools of statutory construction."  *Sung Kil Jang v. Lynch*, 812 F.3d 1187, 1190 (9th Cir. 2015) (internal quotation marks omitted).  That includes canons of construction.  *See, e.g.*, *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1629-30 (2018).  If Congress's

intent is clear, the Court's analysis ends. *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-843 (1984). If not, the Court evaluates whether the agency's interpretation "is based on a permissible construction of the statute." *Id.* at 843.

The Court reviews EPA's interpretation of its own regulations under the *Auer v. Robbins*, 519 U.S. 452 (1997) framework. *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2411-12 (2019). Where an agency's interpretation does not qualify for *Chevron* or *Auer* deference, the interpretation receives only the "deference proportional to . . . it[s] power to persuade." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 159 (2012) (internal quotation marks omitted); *see Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

## ARGUMENT

Congress in § 328 drew a clear, administrable line for determining when a platform that is being decommissioned is no longer subject to Title V's permitting requirements: A platform is no longer an OCS source when it ceases to emit and is no longer capable of emitting. In January 2021, EPA agreed. But three months later, EPA changed its mind, offering instead a new interpretation of § 328 that is contrary to the statute's text and EPA's own regulations, while at the same time purporting to delegate interpretive authority to Ventura County in a bid to evade judicial review.

EPA cannot do any of these things.  It cannot unreasonably (re)interpret § 328.  It cannot unlawfully delegate its interpretive authority.  And it cannot insulate its merits determinations from judicial review by unlawfully delegating its interpretive authority over a follow-on question to another entity.  Chevron's petition is fit for review and should be granted.

## I.      CHEVRON'S CHALLENGE IS FIT FOR JUDICIAL REVIEW.

### A.      The April Letter is Final Agency Action.

The Clean Air Act limits judicial review to "final action."  42 U.S.C. § 7607(b)(1); *see Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 478 (2001) (explaining this phrase has the same meaning as "final agency action" in the Administrative Procedure Act).  "[A]gency action" is defined broadly to "include[] the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  5 U.S.C. § 551(13); *see id.* § 551(6) (defining "order").  This definition "is meant to cover comprehensively every manner in which an agency may exercise its power."  *Whitman*, 531 U.S. at 478.

Agency action is final if it (1) "mark[s] the consummation of the agency's decisionmaking process"; and (2) is "one by which rights or obligations have been determined, or from which legal consequences will flow."  *Bennett*, 520 U.S. at 177-178 (internal quotation marks omitted).  This inquiry is "pragmatic and flexible," and turns on "the actual effects of the action"—not the "agency's

21

characterization" of its decision. *Gill v. U.S. Dep't of Just.*, 913 F.3d 1179, 1184 (9th Cir. 2019) (internal quotation marks omitted).

The April Letter is final agency action, both because it repealed the January Letter, which was itself final action, and because the April Letter standing alone satisfies both *Bennett* requirements.

1. In the January Letter, EPA's Deputy Assistant Administrator for the Office of Air and Radiation correctly determined that once a platform in the process of being decommissioned "no longer emit[s] or ha[s] the potential to emit any pollutant," the platform no longer qualifies as an OCS source. ER-8. At that point, the platform is free to surrender its Title V permits without fear of legal consequences. *See id.*; *supra* pp. 6-7, 12-13. EPA also affirmed that emissions from a vessel servicing a former OCS source are not emissions from an OCS source unless the vessel independently qualifies as an OCS source. ER-12.

EPA's permit-applicability determinations have long been recognized as final agency action because they mark the "consummation" of EPA's decisionmaking process. *See TSG Inc. v. EPA*, 538 F.3d 264, 267 (3d Cir. 2008); *see also Bennett*, 520 U.S. at 177-178. That was certainly true with respect to EPA's January Letter. EPA stated its position on how Clean Air Act § 328's text applied to decommissioning platforms. In EPA's considered judgment, "a facility that was once an OCS source can cease to be an OCS source when definitional

criterial are no longer met"; a platform that does not emit and does not have the potential to emit does not qualify as an OCS source; a vessel's emissions are insufficient to transform a platform back into an OCS source; and when a platform located within 25 miles of the shore ceases to be an OCS source, the local permitting authority's regulations "cease to apply." ER-11-13.

Applying this interpretation, EPA explained that the Gail and Grace platforms "would cease to be OCS sources after the Pre-Abandonment and Abandonment phases described by Chevron, and, therefore, would no longer [be] subject to requirements applicable to OCS sources." ER-11. Because "EPA asserted its final position on the factual circumstances upon which the [Letter is] predicated," the January Letter satisfies *Bennett*'s first prong. *Alaska, Dep't of Env't Conservation v. EPA*, 244 F.3d 748, 750 (9th Cir. 2001).

There was no reason to believe EPA's conclusion that the OCS source-permitting requirements would not apply to Chevron if its platforms ceased emitting at the conclusion of pre-abandonment and abandonment was "subject to further Agency review." *Sackett v. EPA*, 566 U.S. 120, 127 (2012); *cf. Navajo Nation v. U.S. Dep't of Interior*, 819 F.3d 1084, 1092 (9th Cir. 2016) (determination regarding applicability of statutory scheme constitutes consummation of "decisionmaking process as to the applicability of" statute). And the mere "possibility" that an agency "may revise" its decision—as EPA suddenly

23

did three months later—"is a common characteristic of agency action, and does not make an otherwise definitive decision nonfinal." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 598 (2016).

The January Letter also gave "rise to 'direct and appreciable legal consequences' " and affected Chevron's rights and obligations, "thereby satisfying the second prong of *Bennett*." *Hawkes Co.*, 578 U.S. at 598 (quoting *Bennett*, 520 U.S. at 178). Take the final order in *Frozen Food Express v. United States*, 351 U.S. 40, 44 (1956). The Interstate Commerce Commission there issued an order designating certain commodities as exempt or nonexempt from a permitting requirement. *Id.* at 41-42. The order was "the basis for carriers in ordering and arranging their affairs" and had "an immediate and practical impact" because it dictated whether a carrier needed a permit and whether carriers operating without a permit "because they believe they carry exempt commodities" would "run civil and criminal risks." *Id.* at 44. The Supreme Court accordingly rejected the Commission's argument that its order was "merely the formal record of conclusions" and did not have any final effect on the carriers. *Id.* at 43 (internal quotation marks omitted).

So too here. Under the January Letter, Chevron was free to surrender its Title V permit once it had completed pre-abandonment and abandonment without facing legal consequences and without further consultation with EPA or Ventura

County. *See* ER-8, ER-13. By relieving Chevron of obligations and eliminating the threat of liability that Chevron would otherwise face, the January Letter "satisf[ied] the second *Bennett* prong." *Hawkes*, 578 U.S. at 599 (agency action that "limits the potential liability" from carrying out certain conduct "without a permit" carries "legal consequence[s]") (internal quotation marks omitted). The January Letter was final action.

2. The April Letter is likewise final because it marked the consummation of EPA's decision to "supersede[ ]" the January Letter and altered the rights and obligations and legal consequences created by the January Letter.

The April Letter's statutory interpretation "mark[ed] the consummation" of EPA's decisionmaking process. *Bennett*, 520 U.S. at 177-178 (internal quotation marks omitted). In the April Letter, EPA set forth EPA's re-interpretation of when an OCS platform ceases to qualify as an "OCS source." Although the April Letter purported to reaffirm the January Letter's conclusion that a platform that does not have the potential to emit is no longer an OCS source, it added something new: Contrary to the statutory text, *see infra* pp. 36-44, EPA determined that "the applicability of OCS permitting requirements *also* depends on whether other equipment or facilities brought to the site . . . or new activities conducted at the site qualify as an OCS source." ER-5 (emphasis added). EPA in April concluded for the first time that a decommissioning platform that no longer has the potential to

emit still might be an OCS source. EPA's interpretive reversal is final action—and a final rejection of the view advocated by Chevron and previously adopted by EPA in the January Letter. *See* ER-22; ER-11-13; *see, e.g.*, *California Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 636 (D.C. Cir. 2019) (finding first finality prong satisfied where EPA reversed its prior statutory interpretation).

The April Letter also finally answered the second question at issue in this case: *who* would determine when a non-emitting platform ceases to be an OCS source. It makes no difference that, as a consequence of EPA's final delegation decision, Ventura County must resolve the follow-on question of *when* a non-emitting platform ceases to be an OCS source. After all, "[t]he finality doctrine is concerned with whether the initial decisionmaker has arrived at a definitive position." *Industrial Customers of Nw. Utils. v. Bonneville Power Admin.*, 408 F.3d 638, 645 (9th Cir. 2005) (internal quotation marks omitted). When the initial decisionmaker provides the " 'last word' " on a topic and "[n]o further agency decisionmaking on that issue can be expected," that is "a clear indication that the first prong of the *Bennett* finality test is satisfied." *Fairbanks N. Star Borough v. U.S. Army Corps of Eng'rs*, 543 F.3d 586, 593 (9th Cir. 2008); *see American Bird Conservancy v. FCC*, 545 F.3d 1190, 1193 n.1 (9th Cir. 2008) ("[f]inal orders are not limited to the last order") (internal quotation marks omitted). EPA here provided its "last word" on both questions presented: Under EPA's new

26

interpretation, a platform that ceases to emit and no longer has the potential to emit can still be an OCS source. That Ventura County will decide when Chevron's non-emitting platforms cease to be OCS sources does not change that conclusion.

In fact, EPA posted the April Letter to its national website for all OCS-platform operators to see. *New Source Review (NSR) Permitting: Additional Environmental Protection Agency (EPA) Views on Outer Continental Shelf Decommissioning Activities at the Chevron U.S.A. Inc. Gail and Grace Platforms*, EPA, https://tinyurl.com/mw49antf (last updated June 17, 2022).[3] That is yet more indicia that the April Letter represented EPA's final word on the legal issues presented. *Cf., e.g.*, *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992) ("An agency action is not final if it is" only the ruling of a "subordinate" who lacks authority to speak for the agency or is otherwise "tentative.") (internal quotation marks omitted).

In abrogating the January Letter and answering these two legal questions, the April Letter also satisfied the second finality prong: it determined Chevron's

---

[3] The April Letter is one of only 15 items featured in the New Source Review homepage's "News and Announcements" section. Several of the other linked items likewise concern nationally applicable determinations, including guidance revising "ambient air" exclusions, guidance on when multiple air pollution-emitting activities are "adjacent" such that they constitute a single source, and guidance on the plantwide applicability limitation. *See New Source Review (NSR) Permitting*, EPA, https://tinyurl.com/4jbh6wvh (last updated Oct. 7, 2022).

"rights or obligations" and carried with it "legal consequences." *Bennett*, 520 U.S. at 178 (internal quotation marks omitted).

To start, EPA's interpretive reversal altered Chevron's potential legal liability. Under the January Letter, once Chevron concludes pre-abandonment and abandonment and the Gail and Grace platforms no longer have the potential to emit, they will not be OCS sources under § 328. *See* ER-8, ER-13. At that point, there would be no need for Chevron to further consult with Ventura County, because Ventura County has enforcement authority only over OCS sources and a platform that can no longer emit is not an OCS source. ER-13. Ventura County therefore could not require Chevron to further consult with it or require Chevron to hold permits for its platforms. The April Letter changed that. *See Environmental Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 869 (9th Cir. 2022) (agency decision reversing the "status quo" and "allow[ing] the permitting process . . . to proceed" "strongly affects the legal rights of" regulated entities); *City of Fremont v. FERC*, 336 F.3d 910, 914 (9th Cir. 2003) (agency order "attach[es] legal consequences" where it alters the parties' "legal positioning" in future proceedings).

The April Letter thus denied Chevron the right to a "safe harbor." *Hawkes Co.*, 578 U.S. at 599 (explaining that an affirmative decision satisfies *Bennett*'s second prong if it "represent[s] the denial of the safe harbor that [a] negative

28

[decision] afford[s]").  Under the January Letter, Chevron would not be subject to legal liability if it surrendered its Title V permit once the platform stopped emitting.  *See* ER-8, ER-12-13; *see also* 42 U.S.C. § 7627(a)(1); 40 C.F.R. § 55.6(c).  Under the April Letter, Chevron potentially faces significant penalties for that same conduct.  *See supra* pp. 6-7; *Sackett*, 566 U.S. at 126 ("legal consequences" flowed from EPA order increasing potential penalties available in a future enforcement proceeding) (internal quotation marks omitted).  That Chevron could petition Ventura County and then seek judicial review if the County determined that a permit was required does not make the April Letter any less final.  Chevron should not have to go through a burdensome and time-consuming process before a state agency that lacks interpretive authority.  *See infra* pp. 53-57.  Moreover, when an agency has already taken final agency action, a petitioner is "not required to engineer a *further* final agency action in a different form in order to bring suit."  *San Francisco Herring Ass'n v. U.S. Dep't of the Interior*, 946 F.3d 564, 579 (9th Cir. 2019).

EPA's interpretive reversal also "has a direct and immediate effect" on Chevron's "day-to-day operations."  *Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006) (internal quotation marks omitted).  Now, Chevron must either proceed "without a permit, risking an EPA enforcement action," or put its decommissioning process on hold, "apply for a permit and seek

29

judicial review if dissatisfied with the results." *Hawkes*, 578 U.S. at 600. The permitting process is "arduous, expensive, and long." *Id.* at 601. "[O]btain[ing] a new . . . permit" can take "at least 12–18 months," ER-99, and cost hundreds of thousands of dollars, *see supra* pp. 8-11; *see also Decommissioning Cost Update*, *supra*, at 7-2. By putting Chevron "to the painful choice" of complying with these obligations or "risk[ing]" a penalty, the April Letter affected Chevron's rights and obligations. *See CSI Aviation Servs., Inc. v. U.S. Dep't of Transp.*, 637 F.3d 408, 412 (D.C. Cir. 2011). And because the Gail and Grace platforms' existing Title V permits are set to expire during the pendency of this litigation, under the April Letter, Chevron must run Ventura County's permitting gauntlet twice: first, to renew its existing permits, and second to obtain new decommissioning-specific permits.[4]

Finally, the April Letter "fix[ed] *some* legal relationship as a consummation of the administrative process": the relationship between EPA and Ventura County. *Oregon Nat. Desert Ass'n*, 465 F.3d at 987 (internal quotation marks omitted). Prior to the April Letter, Ventura County only had the right to implement and

---

[4] *See* Ventura Cnty. Air Pollution Control Dist., *Part 70 Permit No. 1493*, *available at* http://www.vcapcd.org/pubs/Engineering/permits2000/TitleV2000/ current/TV-PO-No-01493-451-461-471-481-May-01-2018.pdf (Platform Grace, valid through Mar. 31, 2023); Ventura Cnty. Air Pollution Control Dist., *Part 70 Permit No. 1494*, *available at* http://www.vcapcd.org/pubs/Engineering/ permits2000/TitleV2000/current/TV-PO-No-01494-581-Final-2022-08-17.pdf (Platform Gail, valid through Dec. 31, 2022); *see also* ER-15 n.4.

enforce § 328—not to interpret it.  The April Letter's delegation of interpretive authority is final, too.  For all of these reasons, the April Letter was final agency action.

### B.  Chevron's Challenge To The April Letter Is Ripe.

"Ripeness is another doctrine that [courts] use to determine whether a case presents a live case or controversy . . . ."  *Safer Chems., Healthy Fams. v. EPA*, 943 F.3d 397, 411 (9th Cir. 2019) (cleaned up).  It has both constitutional and prudential components.  *Id.*  Both are satisfied here.

1. A petitioner with Article III standing has a constitutionally ripe claim.  *Id.* As the object of EPA's administrative action, Chevron's standing is "self-evident." *Los Angeles Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 655 (9th Cir. 2011) (internal quotation marks omitted).  In the January Letter, EPA concluded that a platform that no longer emits or has the potential to emit is no longer an OCS source—full stop.  That conclusion meant Chevron could proceed with its plan to surrender its Title V permits for the Grace and Gail platforms at the conclusion of pre-abandonment and abandonment without further consultation with Ventura County.  ER-11-13.  EPA reversed course in April and concluded that a platform that ceased to emit did not necessarily cease to be an OCS source.  ER-5-6.  Under that decision, Chevron cannot surrender its Title V permits without facing potentially significant penalties and must consult further with Ventura County to

determine its permitting obligations.  *See id.*  As a regulated entity to which EPA's

April determination applies, Chevron has standing to challenge EPA's unlawful

statutory interpretation in the April Letter.

Chevron also has standing because of the compliance burden the April Letter

creates.  *See, e.g.*, *Montana Shooting Sports Ass'n v. Holder*, 727 F.3d 975, 980

(9th Cir. 2013) ("The economic costs of complying with a licensing scheme can be

sufficient for standing.").  The April Letter requires Chevron to further engage

with Ventura County.  ER-6.  Ventura County's guidance indicates that the

consultation the April Letter calls for is likely to delay Chevron's

decommissioning process more than a year, imposing additional costs on Chevron.

*See* ER-99.  Vacating the April Letter and restoring the January Letter's statutory

interpretation would redress these harms by allowing Chevron to proceed with

decommissioning the Gail and Grace platforms, and any other future

decommissioning projects, without these added burdens.

2.  That leaves prudential ripeness.  Courts typically look to "the fitness of

the issues for judicial decision" and "the hardship to the parties of withholding

court consideration."  *Whitman*, 531 U.S. at 479 (internal quotation marks

omitted).  Chevron's petition satisfies both.

Chevron's petition is fit for judicial review.  "[A] claim is fit for decision if

the issues raised are primarily legal, do not require further factual development,

and the challenged action is final." *Wolfson v. Brammer*, 616 F.3d 1045, 1060 (9th Cir. 2010) (internal quotation marks omitted).

All three are true here. Chevron's challenge asks whether the April Letter's construction of § 328 is contrary to the statute's text and whether EPA has unlawfully delegated its interpretive power to Ventura County. Those questions are purely legal, squarely before the Court, and do not depend on any additional facts. *See, e.g.*, *Center for Biological Diversity v. Kempthorne*, 588 F.3d 701, 708 (9th Cir. 2009) ("whether an agency action is arbitrary and capricious is a legal question that would not benefit from further factual development"); *Energy Future Coal. v. EPA*, 793 F.3d 141, 146 (D.C. Cir. 2015) (Kavanaugh, J.) ("If a suit presents a purely legal question of whether EPA's final action violates the Clean Air Act . . . , it is unnecessary to wait for EPA's legal conclusion to be applied in order to determine its legality.") (internal quotation marks omitted). And for all the reasons explained above, EPA's April Letter is sufficiently final. *See supra* pp. 21-31; *see also Ukiah Valley Med. Ctr. v. FTC*, 911 F.2d 261, 264 n.1 (9th Cir. 1990) (explaining that "[f]inality in administrative law" can be "treated as an aspect of the doctrine of ripeness" or "an independent jurisdictional requirement").

Where an issue is fit for judicial decision, "and Congress has emphatically declared a preference for immediate review" by specifying a relatively short time period in which to petition for review, there is no need to "proceed[] to the

[hardship] prong."  *Natural Res. Def. Council, Inc. v. EPA*, 22 F.3d 1125, 1133

(D.C. Cir. 1994) (per curiam) (internal quotation marks omitted); *accord, e.g.*,

*Safer Chems.*, 943 F.3d at 411 ("Where (as here) there is a judicial review

provision in a statute, any prudential ripeness considerations are satisfied for cases

brought under that provision."); *see Whitman*, 531 U.S. at 479 (finding claim

brought under 42 U.S.C. § 7607(b) ripe without determining whether the hardship

alleged "would suffice in an ordinary case brought under the" Administrative

Procedure Act).  The reason for that rule is straightforward.  "[T]he purpose of the

'hardship to the parties' analysis is to ascertain if the harm that deferring review

will cause the petitioners outweighs the benefits it will bring the agency and the

court."  *Eagle-Picher Indus., Inc. v. EPA*, 759 F.2d 905, 918 (D.C. Cir. 1985).  By

specifying a relatively short period for judicial review, Congress has already

weighed the interests of the agency, the court, and the petitioner and determined

that they will be best served by review within the statutory time period.  There are

thus "no conflicting interests to balance."  *Id.*

By specifying that "[a]ny petition for review under" Clean Air Act

§ 307(b)(1) "shall be filed within sixty days" of the challenged action, 42 U.S.C.

§ 7607(b)(1), Congress "emphatically declared a preference for immediate

review."  *Hearth, Patio & Barbecue Ass'n v. EPA*, 11 F.4th 791, 804 (D.C. Cir.

2021) (internal quotation marks omitted).  There is accordingly "no need to

consider the . . . hardship to the parties of withholding review." *Id.* (internal quotation marks omitted); *accord, e.g.*, *Whitman*, 531 U.S. at 479 (noting that, because case was brought under § 7607(b), it was irrelevant whether hardship would "suffice in an ordinary [APA] case").

In any event, delaying review would harm Chevron, because it would "require[] an immediate and significant change in [Chevron's] conduct . . . with serious penalties attached to noncompliance." *Wolfson*, 616 F.3d at 1060. Under § 328 and the January Letter, Chevron was free to surrender its permits once the platforms stopped emitting without further consulting Ventura County or facing potential liability. *Supra* pp. 24-25. But under the April Letter, Chevron is not "free to conduct its business as it sees fit." *National Park Hosp. Ass'n v. Department of Interior*, 538 U.S. 803, 810 (2003); *see also id.* (explaining that a challenge to a regulation that requires a change in conduct is ripe). Rather, Chevron must either change its behavior and run Ventura County's permitting gauntlet, or risk serious penalties. *Supra* pp. 28-30. This Court should not delay review until after Chevron has been forced to choose between bad options.

## II.  EPA'S APRIL LETTER IS CONTRARY TO THE CLEAN AIR ACT AND THE AGENCY'S REGULATIONS.

EPA's interpretation in the April Letter is contrary to the text and structure of the Clean Air Act and EPA's own regulation. In analyzing whether Congress or an agency spoke directly to an issue, the Court "must exhaust all the 'traditional

35

tools' of construction,' " including canons of construction. *Kisor*, 139 S. Ct. at 2415 (quoting *Chevron*, 467 U.S. at 843 n.9). Because Congress's intent is clear, this Court's analysis should end there. *Id.* But even if Congress had not spoken clearly, EPA's interpretation lacks the hallmarks of an agency interpretation deserving of *Chevron*, *Auer*, or even *Skidmore* deference. It should be vacated.

### A. A Platform Is Not An OCS Source After It No Longer Has The Potential To Emit, Regardless Of Other Activities That Take Place During Decommissioning.

#### 1. *Section 328's text does not permit EPA to regulate decommissioning after a platform ceases to emit.*

Statutory interpretation "begins with the statutory text." *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004). Here, it "ends there as well" because § 328's text demonstrates that a platform being decommissioned is no longer an OCS source after it can no longer emit. *Id.*

The Clean Air Act authorizes EPA to regulate OCS sources, which it narrowly defines as "any equipment, activity, or facility" that is (1) "emit[ting] or has the potential to emit," (2) regulated under OCSLA, and (3) located on the OCS. 42 U.S.C. § 7627(a)(4)(C). Activities "include, but are not limited to, platform and drill ship exploration, construction, development, production, processing, and transportation." *Id.* Consistent with the Clean Air Act's distinction between stationary and mobile sources, a mobile vessel does not independently qualify as an OCS source, *see supra* pp. 5-8, but emissions from a mobile vessel "servicing or

36

associated with an OCS source . . . shall be considered direct emissions from the OCS source." 42 U.S.C. § 7627(a)(4)(C).

Under § 328, then, a defining feature of an OCS source is that it "emits or has the potential to emit any air pollutant." *Id.* By necessary implication, a platform that no longer emits or has the potential to emit any air pollutant is *not* an OCS source. *Id.* And once the platform is no longer an OCS source, the emissions from any vessel servicing the platform likewise are not considered to be from an OCS source for two reasons. First, § 328(a)(4)(C)'s imputation of a mobile vessel's emissions requires that there be a separate, pre-existing "OCS source," which the platform no longer is. Second, a vessel that is not anchored to the seafloor—and which is therefore a mobile source—cannot independently qualify as an OCS source. *See id.* To be sure, EPA can regulate a vessel as an OCS source if it is "attached to the seabed . . . for the purpose of exploring, developing or producing resources therefrom." 40 C.F.R. § 55.2. But the presence (or absence) of a stationary vessel does not in any way affect the *platform's* OCS-source status.

Taken together, once a platform completes the initial phases of decommissioning and has removed all emissions-generating equipment such that the platform itself is no longer emitting, it no longer qualifies as an OCS source

subject to regulation by EPA or the local permitting district. Indeed, that is what EPA said in the January Letter. ER-11.

In the April Letter, EPA acknowledged each of these straightforward propositions. It conceded that a platform ceases to be an OCS source when it no longer satisfies the statutory criteria. ER-4. It recognized that a platform being decommissioned "no longer qualif[ies]" as an OCS source "after all existing emissions-generating equipment is removed" and the platform no longer has the capability to emit. ER-5. And EPA admitted that emissions from a mobile vessel "alone are not sufficient to" render the platform it is servicing an OCS source. *Id.* EPA thus concluded that once "all emissions-generating equipment is permanently-removed from" a platform, neither the platform nor the vessels servicing it "would be subject to OCS permitting requirements." *Id.*

But the April Letter nevertheless reversed course and concluded that even *after* a platform no longer has the potential to emit, "additional activity conducted at the site or equipment used to dismantle" the platform could render that platform an OCS source subject to regulation by EPA or the local permitting district. *Id.*

EPA's April about-face improperly injects an irrelevant factual inquiry into straightforward statutory text. Start with EPA's claim in the April Letter that the "equipment used to dismantle" a decommissioning platform could render the platform an OCS source. *Id.* The premise of Chevron's inquiry was that, at the

38

end of pre-abandonment and abandonment, all equipment at the platform with the capacity to emit will have been removed from service. *See* ER-4; ER-15. Thus, the only possible emissions are those from mobile vessels, but emissions associated with mobile vessels cannot render an incapable-of-emitting platform an OCS source. 42 U.S.C. § 7627(a)(4)(C); ER-5. That is true whether the emissions come from the vessel itself (like a derrick barge), from another vessel associated with it (like a tugboat pulling a derrick barge), or from equipment on the vessel (like a generator on a derrick barge). *See* ER-65.

If the vessel were to become stationary—that is, "[p]ermanently or temporarily attach[] to the seabed"—the vessel could independently qualify as an OCS source, provided it meets the remaining statutory and regulatory criteria. 40 C.F.R. § 55.2; *see* 42 U.S.C. § 7627(a)(4)(C); *see also* 43 U.S.C. § 1333(a)(1). In that case, the emissions would be attributable to the vessel, not the platform, and could not turn a non-emitting platform back into an OCS source. Accepting EPA's conclusion that it may be able to regulate decommissioning-related emissions after the platform itself is no longer emitting would contravene Congress's careful differentiation of stationary and mobile sources.

Nor can "additional activity conducted at the site . . . to dismantle" the platform turn a non-emitting platform back into an OCS source. ER-5. Under § 328, the emitting-activities that can trigger OCS source-status "include, but are

not limited to, platform and drill ship exploration, construction, development, production, processing, and transportation." 42 U.S.C. § 7627(a)(4)(C). Each of the enumerated examples is an activity conducted by a stationary source as part of the exploration or development process. Construction, development, and production all describe the process of making something or bringing it forth.[5] In this context, these terms refer to locating offshore sources of oil or gas, setting up the platform and associated equipment to extract the oil or gas, extracting the oil or gas, and transporting the oil or gas to the coast for processing and distribution. *See, e.g.*, *The Basics of Offshore Oil & Gas*, Nat'l Ocean Indus. Ass'n, https://tinyurl.com/yut72umz (last visited Nov. 2, 2022) (discussing the processes of "exploration," "production," "transport," "process[ing]," and "distribution").

"[U]nder the established interpretative canons of *noscitur a sociis* and *ejusdem generis*," where a statute includes both "specific words" and a general term indicating a list is non-exhaustive, "the general words are construed to embrace only objects similar in nature to those objects enumerated." *Washington State Dep't of Soc. & Health Servs. v. Guardianship Est. of Keffeler*, 537 U.S. 371,

---

[5] *See, e.g.*, *Construct*, American Heritage Dictionary 315 (2d coll. ed. 1985) ("To form by assembling parts; build."); *Develop*, American Heritage Dictionary 389 ("To make more available or effective: *develop natural resources*."); *Produce*, American Heritage Dictionary 988 ("To bring forth; yield."); *see also* Oil and Gas Dictionary 155-159 (1988) (using "production" to describe various methods of extracting or "recovering" natural resources).

384 (2003) (internal quotation marks omitted).  Applying these canons, a list "including, but not limited to" certain terms, like § 328's "platform and drill ship exploration, construction, development, production, processing, and transportation," may be expanded with only terms similar to those enumerated. The enumerated terms here are all limited to productive uses of offshore energy resources, so the catch-all "activities" must also be so limited.  *See, e.g.*, *Post v. St. Paul Travelers Ins. Co.*, 691 F.3d 500, 520 (3d Cir. 2012) ("[G]eneral expressions such as 'including, but not limited to' that precede a specific list of included items should not be construed in their widest context, but apply only to persons or things of the same general kind or class as those specifically mentioned in the list of examples.") (internal quotation marks omitted); *United States v. Philip Morris USA Inc.*, 396 F.3d 1190, 1200 (D.C. Cir. 2005) ("The words 'including, but not limited to' introduce a non-exhaustive list that sets out specific examples of a general principle.") (citation omitted); *Molloy v. Metropolitan Transp. Auth.*, 94 F.3d 808, 812 (2d Cir. 1996) (similar).

Decommissioning is not a productive use of offshore energy.  Just the opposite:  Decommissioning is the process of "*[e]nding* oil [or] gas . . . operations" so that the platform can no longer productively use or produce offshore energy resources.  30 C.F.R. § 250.1700(a) (emphasis added); *accord* 30 C.F.R. § 585.112 (defining "[d]ecommissioning" as "removing [Bureau of Ocean Energy

Management]-approved facilities and returning the site of the lease or grant to" the required condition).  Decommissioning thus occurs when a platform is "at the end of [its] productive life."  ER-30; *see* Interagency Decommissioning Working Grp., *A Citizen's Guide to Offshore Oil and Gas Decommissioning in Federal Waters Off California* 3 (2019) ("Decommissioning offshore oil and gas facilities is the process of removing the infrastructure and equipment used in the exploration and production of oil and gas in the marine environment.").  Decommissioning is not similar to locating, preparing to extract, and extracting oil or natural gas; decommissioning is, by definition, when a platform *no longer* extracts resources.

EPA's capacious view of "activity" distorts Congress' text.  Congress could have said that any activity that "emits or has the potential to emit" can qualify as an OCS source, without identifying examples of emitting "activities."  Or Congress could have added decommissioning, dismantling, demolition, or deconstruction to the list of activities that render a platform an OCS source.  Indeed, Congress elsewhere included decommissioning in similar lists.  *See, e.g.*, 42 U.S.C. § 2286a(b)(1) (instructing Defense Nuclear Facilities Safety Board to review and evaluate "standards relating to the design, construction, operation, and decommissioning of defense nuclear facilities"); *id.* § 10137(a)(1) (instructing the Secretary of Energy to provide information to certain parties about "the site characterization siting, development, design, licensing, construction, operation,

regulation, or decommissioning of" a radioactive waste depository); *id.* § 17373(b)(7)(A) (defining "nuclear supplier" as someone that "supplies facilities, equipment, fuel, services, or technology pertaining to the design, construction, operation, or decommissioning of a covered installation"). Congress did not do any of that in § 328, and this Court "presume[s] that Congress said what it meant and meant what it said." *Avendano-Ramirez v. Ashcroft*, 365 F.3d 813, 818 (9th Cir. 2004).

Congress had several good reasons to take this different path. *First*, § 328 defines an OCS source in order to delineate when a Title V permit for a particular type of "equipment, activity, or facility" is required. 42 U.S.C. § 7627(a)(4)(C); *see* 40 C.F.R. § 71.4(d) ("any source which is an [OCS] source . . . is subject to the requirement to obtain a permit under title V of the Act"). A permit allows its holder to emit pollutants otherwise prohibited by the Clean Air Act. *See generally* 42 U.S.C. §§ 7661-7661f. But the point of decommissioning is to *cease* emitting air pollutants. It makes little sense to define an OCS source by reference to an activity that would not require a permit, because the activity would not generate any prohibited emissions that a permit would be required for.

*Second*, EPA has authority to regulate only *stationary* sources under § 328, so Congress carefully distinguished between activities properly attributed to the stationary source itself and activities performed using mobile sources. Once a

43

platform no longer emits or has the potential to emit, the remaining

decommissioning activities are performed by vessels, which are mobile sources.

Thus, even if the statute *did* extend to decommissioning "activities," because those

activities would be attributable to the vessels—not the platform—they still could

not turn a non-emitting platform into an OCS source.

*Third*, Congress's approach in § 328 is more administrable. Drawing a clear

line between activities associated with productive uses of offshore energy and

activities associated with decommissioning helps regulated entities better

understand when their permitting obligations for no-longer-capable-of-emitting

platforms are at an end. Congress therefore wisely left decommissioning off the

list of representative activities.

2. *EPA's contrary interpretation of § 328 does not warrant deference.*

Section 328 is not ambiguous, and so EPA's contrary interpretation in the

April Letter is not entitled to deference at *Chevron* step one. But even if § 328

were ambiguous, EPA's interpretation is not entitled to deference at *Chevron* step

two, because EPA's interpretation is neither reasonable nor reasonably explained.

*See Encino*, 136 S. Ct. at 2125. EPA's interpretation is also not entitled to

*Skidmore* deference because it lacks the power to persuade.

1. EPA's interpretation of Clean Air Act § 328(a)(4)(C) is not entitled to

*Chevron* deference. Deference at *Chevron* step two is warranted only if the

agency's interpretation of the statute is "reasonable," in light of the statutory text, structure, history, and purpose. *Diaz-Quirazco v. Barr*, 931 F.3d 830, 840 (9th Cir. 2019); *see Kisor*, 139 S. Ct. at 2416. In assessing this question, the Court looks to what the agency said at the time of the agency action. An issue that is "only addressed tangentially (and possibl[y] only through . . . post-hoc litigation arguments)" does not warrant *Chevron* deference. *Northern California River Watch v. Wilcox*, 633 F.3d 766, 778 (9th Cir. 2011); *see also SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947). "[A]ppellate counsel's '*post hoc* rationalizations' for agency action . . . . do not constitute an exercise of the agency's delegated lawmaking powers." *Martin v. Occupational Safety & Health Rev. Comm'n*, 499 U.S. 144, 156-157 (1991) (internal quotation marks omitted).

EPA's failure to explain its interpretation of § 328 in the April Letter dooms any claim of *Chevron* deference. EPA in the April Letter did not try to justify its conclusion that "other equipment or facilities brought to the site" could transform a decommissioning platform into an OCS source. ER-5. The sum total of EPA's analysis is two sentences: "The dismantling of a platform or the demolition or 'deconstruction' of such a structure *could* be viewed to be similar to the other activities in this sentence. The list of activities covered by the statute is clearly not exclusive." ER-6 (emphasis added).

EPA's equivocal reasoning is hardly the stuff of which reasonable explanations are made.  EPA did not grapple with the established principle that a phrase such as "including but not limited to" is limited by the examples it enumerates.  It did not discuss the commonalities shared by the listed activities.  It did not acknowledge that the activities EPA sought to add to that list are directly contrary to the list of activities that Congress selected—*deconstruction* versus construction; *dismantling* and *demolition* versus development.  EPA also did not explain what standard or test it might apply to determine when permitting would *not* be required.  Nor did EPA suggest that its interpretation serves the statute's goals.  That is not surprising; "[i]t's more than a little doubtful that Congress would have tucked into the mousehole of [§ 328]'s catchall term an elephant that tramples" the Clean Air Act's fundamental distinction between stationary and mobile sources.  *Epic*, 138 S. Ct. at 1626-27.

The April Letter suggests one potential explanation: the "site."  ER-5-6.  It is not clear what the April Letter means, as § 328 regulates the OCS *source*, not the *site* of the OCS source.  Once the platform ceases to emit or have the potential to emit, the only other qualifying "activity" or "equipment" will be associated with vessels engaged in decommissioning, which do not affect whether the *platform* is an OCS source.  *Supra* pp. 38-40, 43-44.  EPA's interpretation in the April Letter is therefore undeserving of *Chevron* deference.  *See Encino Motorcars*, 136 S. Ct.

at 2125 (deference not warranted "where the agency has failed to provide even [a] minimal level of analysis").

2. EPA's interpretation also does not warrant *Skidmore* deference. Because EPA's interpretation is contrary to the text and purpose of the statute, it necessarily lacks the power to persuade. *See, e.g.*, *Padash v. INS*, 358 F.3d 1161, 1168 n.6 (9th Cir. 2004) (*Skidmore* deference not warranted where "the agency's construction is contrary to the policy and purposes of the Act and to the intent of Congress"); *Fogo De Chao (Holdings) Inc. v. U.S. Dep't of Homeland Sec.*, 769 F.3d 1127, 1141 (D.C. Cir. 2014) (where agency "fail[s] to ground its newly adopted" approach "in statutory text, statutory purpose, regulatory guidance, or reasoned analysis," it "lacks the power to persuade under *Skidmore*"). But even if this Court were to apply the traditional *Skidmore* factors, EPA is still not entitled to deference. Under *Skidmore,* the deference owed to an agency interpretation depends on "the degree of the agency's care, its consistency, formality, and relative expertness," all of which speak to "the persuasiveness of the agency's position." *United States v. Mead Corp.*, 533 U.S. 218, 228 (2001) (footnotes omitted). "The approach has produced a spectrum of judicial responses, from great respect at one end, to near indifference at the other." *Id.* (citations omitted).

EPA's interpretation here is at the latter end of the spectrum. To start, the Agency's analysis was hardly "thorough[ ]." *Id.* at 228 n.7 (internal quotation

marks omitted).  It amounted to just two conclusory lines, devoid of any analysis or explanation.  *See* ER-6.  Courts have consistently declined to afford *Skidmore* deference to similarly perfunctory statements.  *See, e.g.*, *Arteaga-De Alvarez v. Holder*, 704 F.3d 730, 740 (9th Cir. 2012) (agency decision "consist[ing] of one conclusory sentence . . . is not thoroughly reasoned, and, as it lacks any explanation, it also lacks the 'power to persuade' ") (quoting *Skidmore*, 323 U.S. at 140); *Choin v. Mukasey*, 537 F.3d 1116, 1120 (9th Cir. 2008) (agency decision that "consists of two paragraphs that offer little explanation for why the [agency] reached its conclusion" "does not evidence significant consideration or thoroughness").

Nor is EPA's interpretation consistent.  The April Letter directly contradicted the January Letter.  *Compare* ER-5-6, *with* ER-11-13.  The April Letter, however, did not acknowledge how radically the Agency had changed its January position, let alone thoroughly and cogently explain EPA's reversal.  *Cf. McMaster v. United States*, 731 F.3d 881, 892 (9th Cir. 2013) (*Skidmore* deference warranted where agency's change in view was based on a "persuasive interpretation of the law") (internal quotation marks omitted).

The April Letter also did not attempt to justify EPA's delegation of authority to Ventura County to determine a purely federal question.  *See, e.g.*, *Miller v. Sessions*, 889 F.3d 998, 1001-02 (9th Cir. 2018) (refusing to defer to an agency

decision that "contains no reasoning of any substance on the issue" under consideration, because "there is nothing . . . to defer to"); *Rivera v. Lynch*, 816 F.3d 1064, 1071 (9th Cir. 2016) (declining to grant *Skidmore* deference where the agency's opinion contains "no analysis at all") (internal quotation marks omitted).

Moreover, the April Letter, although final, lacked several hallmarks of "formality," as it was not the product of a notice-and-comment rulemaking or a formal adjudication. *See Mead*, 533 U.S. at 228 n.9 ("internal agency guideline that is not 'subject to the rigors of the [APA], including public notice and comment,' is entitled only to 'some deference' ") (quoting *Reno v. Koray*, 515 U.S. 50, 61 (1995)); *see also Gill*, 913 F.3d at 1189 (finding agency action was final but not a legislative rule).  For all these reasons, EPA's April interpretation of § 328(a)(4)(C) lacks the "power to persuade."  *Skidmore*, 323 U.S. at 140.

> **B.**     **EPA Lacks Authority Under Its Own Regulations To Regulate Decommissioning After A Platform Can No Longer Emit.**
>
>> 1.     *40 C.F.R. § 55.2 does not permit EPA to regulate decommissioning after a platform ceases to emit.*

EPA's regulations adopt § 328's definition of an OCS source, with one relevant addition:  A vessel can qualify as an OCS source when it satisfies the statutory definition of an OCS source *and* it is "[p]ermanently or temporarily attached to the seabed . . . for the purpose of exploring, developing or producing resources therefrom."  40 C.F.R. § 55.2.  The distinction between a "stationary"

vessel—which can independently qualify as an OCS source—and a mobile

vessel—which cannot—mirrors the Clean Air Act's broader distinction between

mobile and stationary sources. *See supra* pp. 5-8.

Emissions from a stationary vessel engaged in decommissioning cannot

transform a platform that has ceased to emit back into an OCS source. EPA's

vessel-specific OCS-source definition is limited to those vessels that are attached

to the seabed and engaged in "exploring, developing or producing resources" from

the OCS. 40 C.F.R. § 55.2. Like in the Clean Air Act itself, decommissioning is

absent from that list. And unlike the Act, EPA's regulation does not include a

catchall phrase embracing similar exploratory or productive activities. *Cf.* 42

U.S.C. § 7627(a)(4)(C). By enumerating a set of activities, EPA necessarily

excluded other activities a platform might engage in, like decommissioning. *See*

*NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 940 (2017) ("expressing one item of [an]

associated group or series excludes another left unmentioned") (internal quotation

marks omitted).

Once again, EPA's contrary argument is perfunctory at best. It did not even

attempt to claim that a vessel involved in "dismantling," "demoli[shing]," or

"deconstruct[ing]" a platform is actually "exploring, developing or producing

resources." Rather, EPA concluded that it could not determine whether any vessel

assisting with the decommissioning process would qualify as an OCS source under this definition absent additional information. ER-6.

EPA also did not attempt to invoke the separate provision in 40 C.F.R. § 55.2, which provides that a vessel can be regulated as an OCS source when it is "[p]hysically attached to an OCS facility." *See* ER-6 n.3 (citing this provision in a footnote without analysis). For good reason: An "OCS facility" is just a facility that qualifies as an OCS source. *See* 42 U.S.C. § 7627(a)(4)(C); 40 C.F.R. § 55.2. The proviso that emissions from a vessel physically attached to an OCS source can be attributed to the OCS source therefore tracks § 328, which provides that "emissions from any vessel servicing or associated with an OCS source, including emissions while at the OCS source . . . shall be considered direct emissions from the OCS source." 42 U.S.C. § 7627(a)(4)(C). Just as servicing a platform that used to be an OCS source cannot transform a mobile vessel or the platform into an OCS source, physically attaching to what was once but is no longer an OCS facility cannot transform a mobile vessel or the facility into an OCS source.

      2.    *EPA's Interpretation of OCS Source in 40 C.F.R. § 55.2 is not entitled to* Auer *or* Skidmore *deference.*

EPA's interpretation of its own regulation is not entitled to *Auer* deference. *See Auer*, 519 U.S. at 461. For one, "[d]eference is undoubtedly inappropriate" because EPA's interpretation in the April Letter is "plainly erroneous or inconsistent with the" regulatory text. *Christopher*, 567 U.S. at 155 (quoting *Auer*,

51

519 U.S. at 461); *see supra* pp. 49-51. But even if the Court finds EPA's regulation "genuinely ambiguous" after resorting "to all the standard tools of interpretation," a "reasonable agency reading of a genuinely ambiguous rule" receives *Auer* deference only if warranted by "the character and context of the agency interpretation." *Kisor*, 139 S. Ct. at 2414-16. To pass that test, the agency's interpretation must, among other things, "reflect fair and considered judgment." *Id.* at 2416-17 (internal quotation marks omitted).

EPA's interpretation of its own regulation flunks that requirement. "A court may not defer to a new interpretation . . . that creates 'unfair surprise' to regulated parties" by "substitut[ing] one view of a rule for another." *Id.* at 2417-18 (quoting *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 170 (2007)). The April Letter did just that by reversing the January Letter's view that a platform that can no longer emit is not an OCS source. *See id.* (explaining that "the upending of reliance may happen without . . . an explicit interpretive change"). This is a particularly poor case for deference because EPA "upend[ed]" Chevron's "reliance" on the January Letter with no notice and based on essentially no reasoning at all. *See id.*; *supra* pp. 27-30. And because EPA's interpretation of its own regulation suffers from the same flaws as its statutory interpretation, it likewise is undeserving of *Skidmore* deference. *See supra* pp. 44-49; *Christopher*, 567 U.S. at 159.

## III. EPA'S APRIL LETTER IMPERMISSIBLY DELEGATES INTERPRETIVE AUTHORITY TO THE LOCAL DISTRICT.

Congress in § 328 answered whether a no-longer-capable-of-emitting decommissioning platform nevertheless remains an OCS source: No. *Supra* pp. 36-44. EPA cannot reinterpret § 328's plain text. *See, e.g.*, *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 462 (2002) (where statute is "unambiguous," Congress "did not delegate authority to" interpret that provision). And "EPA cannot delegate to [another entity] more authority than the EPA has." *Northern Plains Res. Council v. Fidelity Expl. & Dev. Co.*, 325 F.3d 1155, 1164 (9th Cir. 2003). By nevertheless purporting to delegate to Ventura County the power to interpret that unambiguous provision, EPA violated the scheme Congress created.

Even if EPA could have exercised *its* interpretive authority to decide this question, EPA violated § 328 by sub-delegating that authority to Ventura County. "When a statute delegates authority to a federal officer or agency, subdelegation to a subordinate *federal* officer or agency is presumptively permissible absent affirmative evidence of a contrary congressional intent." *Frankl v. HTH Corp.*, 650 F.3d 1334, 1350 (9th Cir. 2011) (emphasis added) (quoting *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 565 (D.C. Cir. 2004)). Although "[t]here is no such presumption covering subdelegations to outside parties," *U.S. Telecom*, 359 F.3d at 565, subdelegation to a separate sovereign "is not per se improper" and need not "rest on express statutory authority," *Southern Pac. Transp. Co. v. Watt*, 700 F.2d

550, 556 (9th Cir. 1983). Where a subdelegation is expressly authorized, it must be construed narrowly. *See United States v. Emerson*, 846 F.2d 541, 547 (9th Cir. 1988) (subdelegation of one power does not presume subdelegation of another, "marked[ly]" different power). Where Congress did not expressly authorize subdelegation to a state agency, this Court looks "to the purpose of the statute to set" the subdelegation's "parameters." *Assiniboine & Sioux Tribes of Fort Peck Indian Rsrv. v. Board of Oil & Gas Conservation of Montana*, 792 F.2d 782, 795 (9th Cir. 1986).

The April Letter improperly delegates EPA's interpretive authority to Ventura County. The Clean Air Act is "[b]uilt on a scheme of cooperative federalism." *MacClarence v. EPA*, 596 F.3d 1123, 1125 (9th Cir. 2010) (internal quotation marks omitted). Congress authorized EPA to delegate to local entities the authority to "implement and enforce" requirements related to the regulation of OCS sources within 25 miles of land. 42 U.S.C. § 7627(a)(1), (a)(3). But Congress did not grant EPA the authority to delegate its interpretative power. *Id.*; *see id.* § 7412(*l*)(1) (authorizing EPA to delegate to the States the power to create a program "for the implementation and enforcement . . . of emission standards"); *see also, e.g.*, *id.* § 7407(a) (Clean Air Act delegating implementation of air quality standards to States). Consistent with these limits, the Ventura County delegation agreement authorized the County "to implement and enforce the OCS air

54

regulations," but provided that Ventura County "will request" guidance from EPA "on any matter involving the interpretation of section 328." EPA, *Ventura County APCD Agreement for Delegation of Authority for Outer Continental Shelf Air Regulations (40 CFR Part 55)*, at 2, 4 (Jan. 27, 1994).

EPA exceeded that limit here. In the April Letter, EPA concluded that an OCS source that stops emitting does not necessarily stop qualifying as an OCS source. EPA delegated to Ventura County the task of interpreting the Clean Air Act to answer the follow-on question of when, under the Act, a platform that can no longer emit ceases to be an OCS source. EPA instructed Ventura County to "determine the appropriate point at which no 'OCS source' exists at the site." ER-6. And although EPA "encourag[ed]" Ventura County "to consult with [EPA]," it plainly left the "final determination" in the County's hands. *Id.*

That violates the text and structure of the Clean Air Act. Congress spoke clearly on this issue: It expressly authorized EPA to delegate implementation and enforcement authority—but not interpretive authority. EPA's subdelegation in the April Letter therefore violates the Clean Air Act. *Cf. Frankl*, 650 F.3d at 1350-52 (holding statutory language providing that delegee "shall have such other duties as the [delegator] may prescribe or as may be provided by law" authorized subdelegation) (internal quotation marks omitted). Even if this Court were to consult the statutory purpose, the result is the same. Because the Clean Air Act's

permitting process is so burdensome, the Act "places the onus of" implementing

and enforcing the permitting regime "on state and local governments."

*MacClarence*, 596 F.3d at 1125. By contrast, "EPA has been delegated authority

by Congress to interpret the statutory scheme that the Clean Air Act has entrusted

to its administration." *Riverside Cement Co. v. Thomas*, 843 F.2d 1246, 1247 (9th

Cir. 1988). Centralizing interpretive authority in EPA creates national uniformity

and consistency, while still "maintain[ing] a substantial role for states in . . .

implementation and enforcement." *In re Volkswagen "Clean Diesel" Mktg., Sales

Pracs., & Prods. Liab. Litig.*, 959 F.3d 1201, 1215 (9th Cir. 2020). This division

of authority also honors both EPA's and localities' respective expertise and

capabilities, and the localities' "historic police powers" in this area. *Id.*

EPA's decision to "encourag[e]" Ventura County "to consult with [EPA]

prior to" the County "making a final determination" about the interpretation of

§ 328 cannot save EPA's unlawful delegation. ER-6. "[A] federal agency may

turn to an outside entity for advice and policy recommendations" only if "the

agency makes the final decisions itself." *WildEarth Guardians v. EPA*, 759 F.3d

1064, 1073 (9th Cir. 2014) (quoting *U.S. Telecom*, 359 F.3d at 568); *cf.*

*Assiniboine*, 792 F.2d at 794-795 (explaining that merely "rubber-stamp[ing]"

subdelegee's decisions "constitute[s] an unlawful delegation of authority")

(internal quotation marks omitted). The entity here making the "final

determination" is clearly specified—and it is not the federal agency.  For this reason, too, the Court should vacate the April Letter.

## CONCLUSION

For the foregoing reasons, the petition for review should be granted and EPA's April Letter vacated.

Respectfully submitted,

/s/ Catherine E. Stetson

ASHLEY C. PARRISH
ILANA SALTZBART
KING & SPALDING LLP
1700 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
(202) 737-0500

I. CASON HEWGLEY IV
KING & SPALDING LLP
1100 Louisiana Street
Suite 4100
Houston, TX 77002
(713) 751-3200

CATHERINE E. STETSON
SEAN MAROTTA
DANIELLE DESAULNIERS STEMPEL
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
cate.stetson@hoganlovells.com

*Counsel for Chevron U.S.A. Inc.*

November 2, 2022

## CERTIFICATE OF COMPLIANCE

1.     This document complies with the type-volume limit of Ninth Circuit Rule 32-1(a) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 13,026 words.

2.     This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman.

/s/ Catherine E. Stetson
Catherine E. Stetson



**ADDENDUM**

# TABLE OF CONTENTS

Page

42 U.S.C. § 7607(b) ...................................................................Add. 1

42 U.S.C. § 7627(a) ...................................................................Add. 3

40 C.F.R. § 55.2 ........................................................................Add. 6

i

## § 7607. Administrative proceedings and judicial review

\* \* \*

### (b) Judicial review

(1) A petition for review of action of the Administrator in promulgating any national primary or secondary ambient air quality standard, any emission standard or requirement under section 7412 of this title, any standard of performance or requirement under section 7411 of this title,, any standard under section 7521 of this title (other than a standard required to be prescribed under section 7521(b)(1) of this title), any determination under section 7521(b)(5) of this title, any control or prohibition under section 7545 of this title, any standard under section 7571 of this title, any rule issued under section 7413, 7419, or under section 7420 of this title, or any other nationally applicable regulations promulgated, or final action taken, by the Administrator under this chapter may be filed only in the United States Court of Appeals for the District of Columbia. A petition for review of the Administrator's action in approving or promulgating any implementation plan under section 7410 of this title or section 7411(d) of this title, any order under section 7411(j) of this title, under section 7412 of this title, under section 7419 of this title, or under section 7420 of this title, or his action under section 1857c-10(c)(2)(A), (B), or (C) of this title (as in effect before August 7, 1977) or under regulations thereunder, or revising regulations for enhanced monitoring and compliance certification programs under section 7414(a)(3) of this title, or any other final action of the Administrator under this chapter (including any denial or disapproval by the Administrator under subchapter I) which is locally or regionally applicable may be filed only in the United States Court of Appeals for the appropriate circuit. Notwithstanding the preceding sentence a petition for review of any action referred to in such sentence may be filed only in the United States Court of Appeals for the District of Columbia if such action is based on a determination of nationwide scope or effect and if in taking such action the Administrator finds and publishes that such action is based on such a determination. Any petition for review under this subsection shall be filed within sixty days from the date notice of such promulgation, approval, or action appears in the Federal Register, except that if such petition is based solely on grounds arising after such sixtieth day, then any petition for review under this subsection shall be filed within sixty days after such grounds arise. The filing of a petition for reconsideration by the Administrator of any otherwise final rule or action shall not affect the finality of such rule or action

for purposes of judicial review nor extend the time within which a petition for judicial review of such rule or action under this section may be filed, and shall not postpone the effectiveness of such rule or action.

(2) Action of the Administrator with respect to which review could have been obtained under paragraph (1) shall not be subject to judicial review in civil or criminal proceedings for enforcement. Where a final decision by the Administrator defers performance of any nondiscretionary statutory action to a later time, any person may challenge the deferral pursuant to paragraph (1).

* * *

## 42 U.S.C. § 7627

**§ 7627. Air pollution from Outer Continental Shelf activities**

**(a) Applicable requirements for certain areas**

**(1) In general**

Not later than 12 months after November 15, 1990, following consultation with the Secretary of the Interior and the Commandant of the United States Coast Guard, the Administrator, by rule, shall establish requirements to control air pollution from Outer Continental Shelf sources located offshore of the States along the Pacific, Arctic and Atlantic Coasts (other than Outer Continental Shelf sources located offshore of the North Slope Borough of the State of Alaska), and along the United States Gulf Coast off the State of Florida eastward of longitude 87 degrees and 30 minutes ("OCS sources") to attain and maintain Federal and State ambient air quality standards and to comply with the provisions of part C of subchapter I. For such sources located within 25 miles of the seaward boundary of such States, such requirements shall be the same as would be applicable if the source were located in the corresponding onshore area, and shall include, but not be limited to, State and local requirements for emission controls, emission limitations, offsets, permitting, monitoring, testing, and reporting. New OCS sources shall comply with such requirements on the date of promulgation and existing OCS sources shall comply on the date 24 months thereafter. The Administrator shall update such requirements as necessary to maintain consistency with onshore regulations and this chapter. The authority of this subsection shall supersede section 5(a)(8) of the Outer Continental Shelf Lands Act but shall not repeal or modify any other Federal, State, or local authorities with respect to air quality. Each requirement established under this section shall be treated, for purposes of sections 7413, 7414, 7416, 7420, and 7604 of this title, as a standard under section 7411 of this title and a violation of any such requirement shall be considered a violation of section 7411(e) of this title.

**(2) Exemptions**

The Administrator may exempt an OCS source from a specific requirement in effect under regulations under this subsection if the Administrator finds that compliance with a pollution control technology requirement is technically infeasible or will cause an unreasonable threat to health and safety. The Administrator shall make written findings explaining the basis of any exemption issued pursuant to this subsection and shall impose another requirement equal to or

Add. 3

as close in stringency to the original requirement as possible. The Administrator shall ensure that any increase in emissions due to the granting of an exemption is offset by reductions in actual emissions, not otherwise required by this chapter, from the same source or other sources in the area or in the corresponding onshore area. The Administrator shall establish procedures to provide for public notice and comment on exemptions proposed pursuant to this subsection.

**(3) State procedures**

Each State adjacent to an OCS source included under this subsection may promulgate and submit to the Administrator regulations for implementing and enforcing the requirements of this subsection. If the Administrator finds that the State regulations are adequate, the Administrator shall delegate to that State any authority the Administrator has under this chapter to implement and enforce such requirements. Nothing in this subsection shall prohibit the Administrator from enforcing any requirement of this section.

**(4) Definitions**

For purposes of subsections (a) and (b)--

**(A) Outer Continental Shelf**

The term "Outer Continental Shelf" has the meaning provided by section 2 of the Outer Continental Shelf Lands Act (43 U.S.C. 1331).

**(B) Corresponding onshore area**

The term "corresponding onshore area" means, with respect to any OCS source, the onshore attainment or nonattainment area that is closest to the source, unless the Administrator determines that another area with more stringent requirements with respect to the control and abatement of air pollution may reasonably be expected to be affected by such emissions. Such determination shall be based on the potential for air pollutants from the OCS source to reach the other onshore area and the potential of such air pollutants to affect the efforts of the other onshore area to attain or maintain any Federal or State ambient air quality standard or to comply with the provisions of part C of subchapter I.

### (C) Outer Continental Shelf source

The terms "Outer Continental Shelf source" and "OCS source" include any equipment, activity, or facility which--

    **(i)** emits or has the potential to emit any air pollutant,

    **(ii)** is regulated or authorized under the Outer Continental Shelf Lands Act, and

    **(iii)** is located on the Outer Continental Shelf or in or on waters above the Outer Continental Shelf.

Such activities include, but are not limited to, platform and drill ship exploration, construction, development, production, processing, and transportation. For purposes of this subsection, emissions from any vessel servicing or associated with an OCS source, including emissions while at the OCS source or en route to or from the OCS source within 25 miles of the OCS source, shall be considered direct emissions from the OCS source.

### (D) New and existing OCS sources

The term "new OCS source" means an OCS source which is a new source within the meaning of section 7411(a) of this title. The term "existing OCS source" means any OCS source other than a new OCS source.

\* \* \*

## § 55.2 Definitions.

*Administrator* means the Administrator of the U.S. Environmental Protection Agency.

*Corresponding Onshore Area (COA)* means, with respect to any existing or proposed OCS source located within 25 miles of a State's seaward boundary, the onshore area that is geographically closest to the source or another onshore area that the Administrator designates as the COA, pursuant to § 55.5 of this part.

*Delegated agency* means any agency that has been delegated authority to implement and enforce requirements of this part by the Administrator, pursuant to § 55.11 of this part. It can refer to a State agency, a local agency, or an Indian tribe, depending on the delegation status of the program.

*Existing source or existing OCS source* shall have the meaning given in the applicable requirements incorporated into §§ 55.13 and 55.14 of this part, except that for two years following the date of promulgation of this part the definition given in § 55.3 of this part shall apply for the purpose of determining the required date of compliance with this part.

*Exploratory source or exploratory OCS source* means any OCS source that is a temporary operation conducted for the sole purpose of gathering information. This includes an operation conducted during the exploratory phase to determine the characteristics of the reservoir and formation and may involve the extraction of oil and gas.

*Modification* shall have the meaning given in the applicable requirements incorporated into §§ 55.13 and 55.14 of this part, except that for two years following the date of promulgation of this part the definition given in section 111(a) of the Act shall apply for the purpose of determining the required date of compliance with this part, as set forth in § 55.3 of this part.

*Nearest Onshore Area (NOA)* means, with respect to any existing or proposed OCS source, the onshore area that is geographically closest to that source.

*New source or new OCS source* shall have the meaning given in the applicable requirements of §§ 55.13 and 55.14 of this part, except that for two years following the date of promulgation of this part, the definition given in § 55.3 of this part shall apply for the purpose of determining the required date of compliance with this part.

*OCS source* means any equipment, activity, or facility which:

(1) Emits or has the potential to emit any air pollutant;

(2) Is regulated or authorized under the Outer Continental Shelf Lands Act ("OCSLA") (43 U.S.C. § 1331 et seq.); and

(3) Is located on the OCS or in or on waters above the OCS.

This definition shall include vessels only when they are:

(1) Permanently or temporarily attached to the seabed and erected thereon and used for the purpose of exploring, developing or producing resources therefrom, within the meaning of section 4(a)(1) of OCSLA (43 U.S.C. § 1331 et seq.); or

(2) Physically attached to an OCS facility, in which case only the stationary sources aspects of the vessels will be regulated.

*Onshore area* means a coastal area designated as an attainment, nonattainment, or unclassifiable area by EPA in accordance with section 107 of the Act. If the boundaries of an area designated pursuant to section 107 of the Act do not coincide with the boundaries of a single onshore air pollution control agency, then onshore area shall mean a coastal area defined by the jurisdictional boundaries of an air pollution control agency.

*Outer continental shelf* shall have the meaning provided by section 2 of the OCSLA (43 U.S.C. § 1331 et seq.).

*Potential emissions* means the maximum emissions of a pollutant from an OCS source operating at its design capacity. Any physical or operational limitation on the capacity of a source to emit a pollutant, including air pollution control equipment and restrictions on hours of operation or on the type or amount of material combusted, stored, or processed, shall be treated as a limit on the design capacity of the source if the limitation is federally enforceable. Pursuant to section 328 of the Act, emissions from vessels servicing or associated with an OCS source shall be considered direct emissions from such a source while at the source, and while enroute to or from the source when within 25 miles of the source, and shall be included in the "potential to emit" for an OCS source. This definition does not alter or affect the use of this term for any other purposes under §§ 55.13 or 55.14 of this part, except that vessel emissions must be included in the "potential to emit" as used in §§ 55.13 and 55.14 of this part.

*Residual emissions* means the difference in emissions from an OCS source if it applies the control requirements(s) imposed pursuant to § 55.13 or § 55,14 of this part and emissions from that source if it applies a substitute control requirement pursuant to an exemption granted under § 55.7 of this part.

*State* means the State air pollution control agency that would be the permitting authority, a local air pollution permitting agency, or certain Indian tribes which can be the permitting authority for areas within their jurisdiction. State may also be used in the geographic sense to refer to a State, the NOA, or the COA.

**CERTIFICATE OF SERVICE**

I certify that on November 2, 2022, the foregoing was electronically filed through this Court's CM/ECF system, which will send a notice of filing to all registered users.

/s/ Catherine E. Stetson
Catherine E. Stetson
